454 F.2d 1240
 1972 Trade Cases P 73,793
 Gerald M. ANDERSON, individually and dba AAA Auto Body Shop, Appellant,
v.
AMERICAN AUTOMOBILE ASSOCIATION, a corporation; California
State Automobile Association, a corporation, Appellees.
 No. 24195.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 3, 1972.
Rehearing Denied Feb. 18, 1972.
 
 William I. Cohen, (argued), William E. Anderson, Jr., Palo Alto, Cal., for appellant.
 Seymour Farber, (argued), Matthew P. Mitchell, Marquart, Hutchins & Staiger, San Francisco, Cal., for appellees.
 Before MADDEN,* Judge of the United States Court of Claims, MURRAH** and BROWNING, Circuit Judges.
 MURRAH, Circuit Judge:
 
 
 1
 The American Automobile Association (AAA) and the California State Automobile Association (CSAA) sued Gerald M. Anderson, the owner of AAA Auto Body Shop for trademark infringement and unfair competition. Anderson answered and cross-claimed as representative of a class,[1] alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2. The gist of the cross-complaint is that AAA and CSAA and certain co-conspirators have illegally removed some 10,000,000 members of the American motoring public from the competitive market for automobile towing and repair services. This anti-competitive effect is said to have been accomplished by: (1) the horizontal and vertical allocation of territories and customers necessarily resulting from contractual arrangements whereby AAA and CSAA sell memberships to the motoring public and agree to provide Emergency Road Service, including free towing of the member's disabled vehicle by independent contractors whom CSAA has designated to perform the towing service; and, (2) encouraging and urging their members not to deal with nonaffiliated competitors.
 
 
 2
 Anderson appeals from an order of the District Court granting AAA and CSAA's second motion for summary judgment on the cross-complaint, and we are not here concerned with the trademark or unfair competition issues.[2] The threshold question is the propriety of the summary judgment.
 
 
 3
 We review the summary judgment bearing in mind that such procedure is appropriate only when the facts are fully developed and the issues clearly presented. See Nationwide Auto Appraiser Service, Inc. v. Association of C. & S. Co., 382 F.2d 925, 929, (10th Cir. 1967); Tillamook Cheese and Dairy Ass'n v. Tillamook Co. Cream Ass'n, 358 F.2d 115, 117 (9th Cir. 1966). If under any reasonable construction of the evidence and any acceptable theory of law Anderson would be entitled to prevail, a summary judgment against him cannot be sustained. Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1340 (9th Cir. 1970); see also Fed.R.Civ.P. 56(c). We are, moreover, cautioned to use this summary device ". . . sparingly in complex antitrust litigation where motive and intent play leading roles. . . ." Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). For reasons which we shall point out, we think the record evidence in this case raises issues as to which summary judgment was inappropriate.
 
 The Pre-Summary Judgment Discovery
 
 4
 After discovery proceedings AAA and CSAA, apparently deeming discovery complete, filed their original motion for summary judgment. The trial court denied this motion without prejudice to its renewal after further discovery to be completed without delay and within 90 days unless extended upon a proper showing. During this 90-day period all of the associations' relevant records were made available for inspection and copying. As a result of his investigation Anderson produced at least three items of evidence reflected on the record as being relevant to his antitrust crossclaim. Whereupon, the associations renewed their motion for summary judgment, alleging that the free and open discovery procedures failed to develop a genuine issue of material fact; that the case was, thus, ripe for summary judgment; and that AAA and CSAA were entitled to a judgment on the undisputed facts and law. Anderson responded, saying that he had not completed his analysis of the documents; that he had not had an opportunity to obtain information based upon the documents from members of the class; and, that in any event, the pretrial discovery had, indeed, developed disputed issues of fact and questions concerning motive and intent. He did not, however, at any time formally request additional discovery beyond the 90-day period allowed, and there is nothing in the record to indicate that the discovery was not free and open or that it was not complete.
 
 
 5
 The incident giving rise to Anderson's boycott claim also occurred during this 90-day period, and he sought a preliminary injunction against further actions of this type by the associations. The motion for the preliminary injunction and the renewed motion for summary judgment came on for hearing at the same time. After argument the preliminary injunction was denied and the summary judgment granted.
 
 
 6
 In this posture of the case we will assume that the discovery was complete and that all of the basic proof bearing on Anderson's cross-claim was before the court for its consideration on the motion for summary judgment. But the court's naked order granting the motion discloses no grounds for the judgment, and we are left to speculate as to the reasons underlying the court's decision. Upon consideration of the record before us we agree that the evidence on Anderson's boycott claim did not raise any genuine issues of fact and summary judgment as to it was proper. We think, however, that the basic proof concerning the claimed anti-competitive allocation of territories and customers gave rise to conflicting inferences of fact. As to these issues summary judgment was improper. Inasmuch as the case must be remanded for further consideration, it seems appropriate to express our view of the law applicable to the facts on this record.
 
 The Basic Facts
 
 7
 AAA and CSAA, organized as nonprofit corporations, are associations composed primarily of individual motorists. Their stated purpose is the general improvement of motoring conditions. Membership in CSAA-whose area of operation is Northern California and parts of Nevada-includes affiliate membership in AAA. At the commencement of this litigation in 1967, CSAA had approximately 875,000 members, while AAA had over 10,000,000.
 
 
 8
 Among benefits which members are entitled to receive, upon payment of an annual fee, is free towing service if their vehicle should become disabled. CSAA selects independent businesses, such as garages, automobile dealerships and service stations, to provide this towing service. Under the uniform terms of their written agreements with CSAA these "contract stations" are paid for performing the towing service, not by the member, but by the association. At the time this litigation commenced a contract station was paid a flat rate of $3.50 for any towing within a five-mile radius of its location. Provisions were also made for payments of $.50 for each mile traveled outside of this zone and $6.00 for each hour spent in on the spot servicing of the disabled vehicle after an initial 30-minute period.
 
 
 9
 Each station is assigned a towing territory whose boundaries are determined by the distance from the disabled vehicle to the nearest station. Before responding to a call for service, a contract station must verify that it is the nearest contract station able to provide service. In some metropolitan areas CSAA maintains a central receiving and dispatching service which assigns calls to the nearest available station. Under the terms of their written agreement the association will not pay a contract station for any service performed outside of its towing territory.
 
 
 10
 Both the membership contracts and the contracts with the stations cover only towing and Emergency Road Service. Any repair work must be arranged and paid for by the member, who is free to have it done by any contract or noncontract station. The free towing service includes taking the member's vehicle to the contract station or to any location within five miles of that station.
 
 
 11
 In order to become a contract station a business must complete an application form supplied by CSAA. If the applicant meets standards set by the associations it is approved. But not every approved business is designated a contract station. The associations adhere to a policy of strictly limiting the number of contract stations within a given area. Their determination as to how many contract stations are needed is apparently based on such factors as the population, the amount of motor traffic, and the number of AAA and CSAA members within that area. At the time Anderson filed his cross-claim there were 333 contract stations in Northern California, and approximately 518 stations which had made application and met the required standards, but had not been designated contract stations. In the City of Sunnyvale, California, where Anderson's business is located, there were approximately 21,000 CSAA and AAA members and one contract station. Anderson has never applied for appointment as a contract station.
 
 
 12
 The Claimed Allocation of Customers and Territories
 
 
 13
 As we read the briefs and understand the oral argument, Anderson does not contend that AAA and CSAA may not contract with their members for Emergency Road Service or that they may not also enter into separate contracts with independent businesses for the performance of the service for a stipulated fee. Rather, he says the arbitrary limitation on the number of contract stations designated to perform Emergency Road Service for association members and the restriction upon the area within which they can perform the services operate to suppress competition, not only for the towing business, but also for the captive repair business which the towing service is said to bring to the door of the contract station. In sum, the vice of the arrangement is said to be the arbitrary exclusion of Anderson and his class from the market for the business of members even though they are equally able and willing to perform this service.
 
 
 14
 Anderson claims that the limitations causing this exclusion are actually the product of horizontal agreements among the individual contract stations and, thus, unreasonable per se under the doctrine of such cases as Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), and United States v. Sealy, Inc., 388 U. S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). We think, however, that it is unrealistic to view the contract station arrangement as the product of a horizontal agreement. Although the arrangements may be in the best interests of the stations, there is no semblence of a horizontal agreement either express or implied between them. They have nothing whatsoever to do with the division of territories or allocation of customers. It is the associations, not the individual stations, that have the bargaining power in this situation, and their terms are offered on a take it or leave it basis. We view the restrictive arrangements as solely the product of vertical agreements between the associations and the individual contract stations as to which the rule of reason is applicable. See White Motors Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). If the vertical agreement actually restrains trade it must be unreasonable before it violates the Sherman Act. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).
 
 
 15
 Thus judged, it becomes apparent that the towing contract does not, in and of itself, unreasonably restrain trade. Once a motorist enters into a membership contract with the associations he is effectively and legitimately removed from the towing market. He has contracted for that service and prepaid his towing bill. In these particular circumstances the restrictions on the number of stations and their towing territories cannot be said to limit competition for towing business of the members or deprive Anderson of the right to compete in the market for that business. There is no contention that the associations have acquired a monopoly of potential consumers of towing services in any given geographical territory. We have no occasion, therefor, to consider whether the acquisition of a monopoly would impose on the associations the duty to deal with all stations offering qualified towing services within a given territory. To the extent that the arrangement involves towing alone, we can find nothing in antitrust law to prevent AAA and CSAA from contracting with stations to perform that service and limiting the number of such contract stations as they see fit. They and they alone are the judge of the number of stations needed to insure the viability of a legitimate vertical contractual arrangement.
 
 
 16
 But this is not a complete answer to Anderson's claims. The situation is somewhat different with respect to the repair business which Anderson says is brought to the door of the contract stations by virtue of the towing arrangement to the exclusion of him and members of his class. Unlike the towing situation where the service has been contracted and prepaid, members are still potential consumers in the repair market. And, while they are, to be sure, free to have this repair work done wherever they choose, it seems reasonable to suppose that members requiring Emergency Road Service-especially travelers unfamiliar with the area-would be unlikely to shop for the repair services after they have been towed to the contract station with its repair shop at their fingertips. The repair business, though not included in the service contract, cannot be said to be unanticipated. Indeed, the evidence indicates that it may very well be an important part of their bargain-even a profitable inducement.[3]
 
 
 17
 While the right of the associations to deal only with stations of their choice when providing towing service for members should be recognized and protected, that right may not be exercised in a manner to unreasonably restrain trade. ". . . [O]therwise reasonable trade arrangements must fall if conceived to achieve forbidden ends . . . . If accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, even individual sellers' refusals to deal have transgressed the Act." Times-Picayune v. United States, 345 U.S. 594, 622, 625, 73 S.Ct. 872, 888, 889, 97 L.Ed. 1277 (1953). ". . . [Acts] which are themselves legal lose that character when they become constituent elements of an unlawful scheme." Continental Ore Company v. Union Carbide Corp., 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). And see Poller v. Columbia Broadcasting System, 368 U.S. 464, 468-469, 82 S.Ct. 486, 7 L.Ed.2d 458; Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080, 1085 (7th Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826; Lessig v. Tidewater Oil Company, 327 F.2d 459, 466 (9th Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L. Ed.2d 1046.
 
 
 18
 The associations argue that the only reason for limiting the number of contract stations and their towing territories is to insure prompt and efficient towing service to their members and to make the Emergency Road Service administratively manageable. Anderson, on the other hand, insists that, rather than being grounded on legitimate business motives, these limitations are designed solely to channel to each contract station a sufficient amount of repair work to compensate the station for the dramatically lower payment it receives for towing a member's automobile as opposed to a nonmember's.[4]
 
 
 19
 "To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties, and that it is limited to what is fairly necessary, in the circumstances of the particular case . . . ." Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 406, 31 S.Ct. 376, 384, 55 L.Ed. 502 (1911). If, therefore, the dominant motive for the restrictive arrangements is to compensate the contract stations for unprofitably low towing charges by limiting competition for repair work on members' vehicles, the whole vertical arrangement may operate to unreasonably restrain trade in the automobile repair market. "The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct. It is only if the conduct is not unlawful in its impact in the market place or if the self-interest coincides with the statutory concern with the preservation and promotion of competition that protection is achieved." United States v. Arnold, Schwinn & Co., supra, 388 U.S. at 375, 87 S.Ct. at 1863. The contractual arrangement is not per se or prima facie illegal. It remains for Anderson to prove his case, and it is for the trial court in the first instance to say whether he has or not.
 
 
 20
 The Claimed Boycott of Noncontract Stations
 
 
 21
 The essence of Anderson's boycott claim is that association members are urged and encouraged by the cross-defendants not to do business with noncontract stations. The sole proof on this issue is based on the "Hatcher Incident," and we find it insufficient to forestall summary judgment.
 
 
 22
 George Hatcher, while driving his roommate's car, was involved in an accident. The vehicle was insured by AAA. Hatcher and Bell (the roommate) obtained from Anderson an estimate for repairs and took it to an AAA adjuster. Hatcher filed a Declaration stating that the AAA representative "discouraged us from having the work done by Mr. Anderson and suggested that the car be repaired by Larry Hopkins Pontiac, the AAA contract station in Sunnyvale." AAA and CSAA deposed Hatcher, and he testified that when the representative advised them not to have the car repaired by Anderson he (the adjuster) had stated, "It wouldn't look too good if we were to pay them for repairing damage and us having a lawsuit against them."
 
 
 23
 At best, this evidence is susceptible of the interpretation that Hatcher and Bell were discouraged from doing business with Anderson because of the pending lawsuit. It does not raise a genuine issue of fact as to whether AAA, CSAA and the co-conspirator contract stations have engaged in concerted action to discourage association members from doing business with non-contract stations. See Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and Radiant Burners v. Peoples Gas Light and Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed. 2d 358 (1961). Indeed, Anderson himself testified by deposition that he was aware of no instances in which AAA and CSAA had attempted to get members to boycott non-contract stations. The boycott issue was properly removed from the case by summary judgment.
 
 
 24
 The only genuine issue of fact surviving the pleadings is whether the contract station arrangement operates to unreasonably restrain free competition for repair services. This issue should be resolved in the trial court in the first instance and is accordingly remanded for that purpose.
 
 BROWNING, Circuit Judge (concurring):
 
 25
 I concur in the judgment. I also concur in most of Judge Murrah's opinion. I do not join in those portions dealing with the hypothetical question whether the contract station system would violate the Sherman Act if it affected only the market for towing services. Whether the contract station system unreasonably restrained trade in this case will depend upon the inferences drawn by the trier of fact regarding the purposes of the system and its effect* upon competition in both automobile towing and repair.
 
 MADDEN*, Senior Judge (dissenting):
 
 26
 With due deference, I dissent from the Court's decision. The decision is of prime importance, because it in effect invalidates contractual arrangements which ten millions of persons have found convenient and desirable. Adopting Churchillian language it might be said of this decision that never have so many persons had their arrangements nullified by so few.
 
 
 27
 The Court concludes that when the Association promises its member that if he finds himself in need of having his automobile towed, the towing, if requested by the member, will be done free of charge to the member by a competent operator of a tow truck with whom the Association has made a contract that such service will be furnished to the member and paid for by the Association. The price which the Association, in its contract with the towing contractor, agrees to pay him for the service, is not as large as the price which a tow-truck operator would charge a person who, without any Association or other prepayment arrangement, happened to employ the tow truck operator for towing service. In selecting competent repair garages which are willing to contract with the Association for towing service for less than normal charges, the Association as an inducement to an operator of a repair garage to agree to furnish towing service to Association members, at less than the usual going rates for towing, points out to the garage operator that if the automobile which he tows for a member will need repair work after it is towed, that repair garage operator will have a substantial likelihood of being employed by the owner of the automobile to do the repair work at normally profitable prices. That likelihood will be the natural result of his having become acquainted with the automobilist who was in trouble, of having made an impression on him that the tower is a competent and considerate operator, and frequently by having towed the automobile to the general area of the tower's repair garage. The repair garage which is one of those which the Association has selected and contracted with for towing service thus has a potential advantage, which at least occasionally results in an actual advantage, with regard to the profitable repair work, over other repair garages which do not have contracts with the Association for furnishing towing service to Association members. It is this tendency toward monopolizing the repair work which the appellant asserts is a violation of the Sherman Anti-trust Act.
 
 
 28
 As stated at the beginning of this opinion the A.A.A. has ten million members. The record does not, I think, show how many repair garages have contracted with the A.A.A. to supply towing services to A.A.A. members. But there must be at least thousands of them. The A.A.A. argues that the only reason for limiting the number of contract stations and their towing territories is to insure prompt and efficient towing service to their members and to make the Emergency Road Service administratively manageable. In effect, the A.A.A. argues that if it cannot carry on its activities in the way it is now doing, it cannot carry them on at all. Therein, it seems to me, lies the real issue in this case. The appellant does not meet that issue. It merely urges that, whatever the necessity may be, it cannot be met "in a manner to unreasonably restrain trade". So stated, the argument slurs over the word "unreasonably" as if it were not present in the formulation of the question.
 
 
 29
 The opinion of the Court does not meet the issue. It seeks to soften the blow to the expectations and reliances of those ten million members of the A.A.A. by saying "The contractual arrangement is not per se or prima facie illegal (emphasis in original). It remains for Anderson to prove his case, and it is for the trial court in the first instance to say whether he has or not". All that is accomplished by the quoted language and the rather long discussion which precedes it is to keep the case pending.
 
 
 30
 There is no real factual dispute in this case. The facts are that the practice and system of the A.A.A. does have a substantial tendency to create a monopoly of the automobile repair business, in the repair garages which having towing contracts with the A.A.A. The circumstances are shown in the record of the trial court, or are so generally known that the Trial Court knew them and this Court knows them. There is no evidence or even suggestion that there is any other practicable method of carrying on a prepaid insurance towing system except the method now before this court and which was before the Trial Court.
 
 
 31
 Before the Trial Court closed the case by issuing its summary judgment, it extended to both parties full opportunity for further discovery and the presentation of additional evidence, but nothing further was presented. Now this Court has remanded the case to the Trial Court. If no further relevant evidence is presented, the Trial Court will be in the same situation that it was in before it granted the summary judgment in favor of the A.A.A. The question for it will be what should the judgment be, on the basis of this uncontroverted evidence and the judicial knowledge which we have. The Trial Court will be aware, as it was the first time, that the attack is upon the entire system of prepaid towing service, used and depended on by 10 millions of automobilists, and that the A.A.A. and any other association using a comparable system, and their thousands of contract garages will be vulnerable to law suits; that the inevitable result will be the destruction of the system. The Trial Court will be aware that this Court has said in this case that the A.A.A. arrangement "is not per se or prima facie illegal", that it will take a law suit in each case to determine whether it is illegal in that case, but that the law suits and appeals from them will still drive the prepaid towing arrangement out of business.
 
 
 32
 The Trial Court will be aware that the Sherman Act, as interpreted by the Supreme Court, proscribes only unreasonable restraints upon competition. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 53 L.Ed. 619 (1911); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The Court might well conclude, as I would, that a prepaid towing charge system which has been operating for decades, to the satisfaction of many millions of automobilists and has never even been attacked as illegal, is not an unreasonable restraint of competition.
 
 
 33
 As for me, the weighty admonition of Chief Judge Cardozo in Coler v. Corn Exchange Bank, 250 N.Y. 136, 164 N.E. 882 (1928), "Not lightly [to be] vacated is the verdict of quiescent years" would be persuasive. For decades, the system has been used, the statute has not been amended, the prosecuting authorities have been inactive and have been under no pressure to act. I think this Court should not become responsible for such really devastating destruction.
 
 
 34
 I would affirm the judgment.
 
 
 
 *
 The Honorable J. Warren Madden, Senior Judge of the United States Court of Claims, sitting by designation
 
 
 **
 The Honorable Alfred P. Murrah, Senior United States Circuit Judge from the Tenth Circuit, sitting by designation
 
 
 [1]
 A final determination has not yet been made as to whether this case satisfies the requirements for class actions described in Fed.R.Civ.P. 23(b)
 
 
 [2]
 AAA and CSAA's motion to dismiss the appeal for lack of certification as required by Fed.R.Civ.P. 54(b), was denied at an earlier date by a different panel of this Court
 
 
 [3]
 Anderson's proof on this point consisted of the following documents and testimony:
 (a) "Mr. Cohen: . . . the average motorist calling up to have his car towed, would he pay $3.50 for a tow within five miles?
 "The Witness: He would pay more than that, particularly for a tow. . . .
 "Q. You mentioned that these rates were to-what-reimburse the contract station? . . . Is that supposed to cover their cost or to permit them to make a profit?
 "A. Well it doesn't-frankly, it doesn't provide for them making much profit on what we actually pay for the service. They feel their advantage is to represent us as a contract station. . . .
 "Q. And I suppose they could obtain repair work and automotive work on the basis of, say, doing some towing or providing some other type of service?
 "A. That is possible of course."
 (Deposition of George J. Conway, Mgr. of Emergency Road Service Dept. CSAA, pp. 62-63.)
 (b) "The California State Automobile Association follows a plan in appointing contract Emergency Road Service stations that gives each appointed station a certain specified territory and with it a sufficient volume of calls to make the venture profitable."
 (From letter of 2/28/69 by Mr. Baty, Asst. Mgr. CSAA Emergency Road Service Dept.)
 (c) "There was some discussion on the contract rate of $6.00 an hour we pay to San Mateo Chrysler-Plymouth Inc. Gaston said that he can hardly break even on a rate of this type. It was explained that this is the rate we have with all our contract stations and that frankly, service stations and other smaller outlets are able to handle our calls with this rate. Mr. Periat was told that the contract is not designed so that the stations will get rich just on emergency road service calls alone, but it is the business that is taken in by the shops that shows the profit. It was added that any station that cannot show a profit by bringing in additional business from the contracts of 3-A members should perhaps not be affiliated with the Association. No more was said by Mr. Periat about our rate."
 (Memorandum of 9/19/68 from G. Nathan, Field Rep. Emergency Road Service Dept.)
 (d) "CSAA AFFILIATION WILL BRING YOU NEW BUSINESS
 "An emergency road service contract station is provided with an unequalled opportunity to meet potential customers.
 "Remember: Every AAA member who calls you for service is having automobile trouble of some kind.
 "If an AAA member needs service in your area, it is you who will serve him-not a competitor."
 (CSAA Emergency Road Manual for Contract Stations.)
 
 
 [4]
 The record shows that in 1967, while CSAA might have paid only $3.50 to the Sunnyvale contract station for towing a member's automobile less than five miles, a non-member would have been charged $20, the standard fee charged by all Sunnyvale towing services-including the one local contract station-for normal towing
 
 
 *
 For example, AAA and CSAA members in Anderson's area number 21,000, a substantial share of the market for towing and repair services. There is only one contract station in the area, and it receives four to six times as many road service calls as does Anderson. Anderson claims that the contract station system reduces his business by half
 
 
 *
 Honorable J. Warren Madden, Senior Judge, United States Court of Claims, sitting by designation