Harold D. BLANKENSHIP, an individual, Plaintiff-Appellant,

v.

The HEARST CORPORATION, a corporation, William H. Myers, an individual, Defendants-Appellees.

No. 73–3163.

United States Court of Appeals, Ninth Circuit.

June 26, 1975.

Timothy H. Fine (argued), G. Joseph Bertain, Jr. and W. Thomas Amen, San Francisco, Cal., James J. Coyle, Thomas R. Sheridan, Simon & Sheridan; Wallace L. Rosvall, Murphy, Thornton, Hinerfeld & Cahill, Los Angeles, Cal., for plaintiff-appellant.

Marvin Gelfand (argued), Philip M. Battaglia, Flint and MacKay, Los Angeles, Cal., for defendants-appellees.

## OPINION

Before KILKENNY and TRASK, Circuit Judges, and RICH,* Judge, United States Court of Customs and Patent Appeals.

TRASK, Circuit Judge:

This is an appeal in a private antitrust action brought in the United States District Court for the Central District of California seeking injunctive relief and damages. The plaintiff and appellant is Harold D. Blankenship, an independent contractor for the purchase, distribution and sale of the *Los Angeles Herald-Examiner* newspaper. The defendants are the Hearst Corporation, publisher of the newspaper, and William H. Myers, Director of Circulation of the newspaper.

The first cause of action was brought and the jurisdiction of the court was invoked to recover damages and for injunctive relief under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because of alleged violations of section 1 of the Sherman Act, 15 U.S.C. § 1. It alleged a combination and conspiracy to fix the retail prices at which the newspaper was sold to home subscribers. The second cause of action alleged a violation of section 1 of the Sherman Act by an unlawful combination and conspiracy to confine the customers to whom the independent contractors sold the newspaper.

Simultaneously with the filing of the complaint, requests and counter requests for preliminary injunctive relief collateral to the principal case, were sought and disposed of. They are not now material to the predominant issues on appeal.

* Honorable Giles S. Rich, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

Harold D. Blankenship prior to March 19, 1973, was a home-delivery dealer of Hearst's *Los Angeles Herald-Examiner.* He engaged in the business of distributing the newspaper to boy and girl newspaper carriers who in turn delivered the paper to home subscribers. He operated within a part of the Los Angeles area as the exclusive dealer for that geographic area. At the time Blankenship was carrying on his business Hearst also maintained an overlapping set of exclusive dealerships for the distribution of the newspaper by street sales—those made from vending machines and retail stores. Hearst granted the street dealers certain advantages in order to maintain the dual distribution scheme: (1) Hearst sold newspapers to its street dealers at a price below what it sold them to home-delivery dealers; (2) Hearst permitted street dealers to return unsold papers for credit but did not allow home-delivery dealers to do the same; and (3) Hearst helped street dealers acquire vending machines but did not do so for home-delivery dealers.

In the fall of 1971 Blankenship expressed interest in entering the business of street-dealing in addition to his home delivery operations. Hearst employees discouraged Blankenship from this move by pointing out the practical difficulties he would have without the lower price and the right to credit for unsold papers. Blankenship did not expand his operation. From September 1, 1970, until May or June 1972, Blankenship distributed newspapers he purchased from Hearst to boys and girls under the age of 18. The carriers delivered the papers and collected from the subscribers. The carriers kept 20 percent of the gross receipts for themselves and paid the balance to Blankenship. When a subscriber failed to pay, the carrier lost his 20 percent share, and Blankenship lost his profit and the cost of papers purchased.

In May or June 1972 Blankenship modified this arrangement. He then sold the newspapers directly to the carriers who in turn sold them to the subscribers. In the event of non-payment by a subscriber Blankenship reimbursed the carrier for out-of-pocket costs.

Prior to that time, in the fall of 1971, Blankenship requested approval of a new weekly collection system to replace the existing monthly procedure. He suggested a system of prices that would be charged by the carriers to the subscribers as follows:

| | |
|---|---|
| Daily and Sunday | $ .85 per week |
| Daily only | $ .60 per week |
| Sunday only | $ .25 per week |

Robert McKinney, Hearst division manager, agreed to the weekly system but stated that the prices should be:

| | |
|---|---|
| Daily and Sunday | $ .70 per week |
| Daily only | $ .55 per week |
| Sunday only | $ .25 per week |

Blankenship told McKinney, "This is not the price I had in mind." McKinney replied, "Well, this is the only price that you can charge—or that can be charged." He stated that he would not permit any subscriber to pay more than $36 per year or $3 per month. These prices were the advertised home-delivery prices for the paper. Blankenship did not convert to the weekly collection system or suggest to his carriers the increased prices.

At the end of August 1972 Blankenship and all other home-delivery and street-delivery dealers received the following letter:

"August 29, 1972

"Dear Dealer:

"It has come to my attention that a dealer has attempted to raise the retail price of the Herald-Examiner. Your attention is directed to all editions of the newspaper wherein the rates are clearly stipulated according to law.

"In order to protect the registration with the U.S. Patent Office and to maintain the newspaper's valuable good will, you must agree not to in-

crease or decrease the price of the newspaper as stipulated.

"Very truly yours,
William H. Myers
Circulation Director"

The dealer mentioned in the letter was not Blankenship. This letter was not sent to the carriers. The intent of the letter according to one Hearst official was to be "a temporary inhibition of price changes until the basic wholesale price changes . . . were implemented." "We had in mind that the dealers would not implement price changes in a checkerboard or haphazard manner until the Price Commission approval had come through and the across-the-board wholesale increase would occur." On February 1, 1973, that general wholesale increase occurred.

At the end of December 1972 Blankenship increased his prices to his carriers and suggested retail increases that were in excess of the amounts suggested in the newspaper flag. Prior to this time another dealer had raised his prices above the flag prices, and Hearst had been enjoined from enforcing any price maintenance program. All the branch managers had been instructed to take no action in the event another dealer increased his prices.

On February 12 or 13, 1973, Blankenship's branch manager Blanchard met with circulation director Myers who informed Blanchard that he was thinking about terminating Blankenship. Blanchard informed Myers that Blankenship was a good dealer. On February 15, 1973, the *Herald-Examiner* gave Blankenship an award for being the most outstanding home-delivery dealer in his branch area for 1972. The next day Myers sent Blankenship notice that his dealership was terminated effective March 19, 1973. Neither Blanchard nor William Presley, Blanchard's superior, recommended this action. The company claims that it took the step because Blankenship was suffering declining subscriptions in his area.

Based on these facts Blankenship filed this suit in federal district court alleging that Hearst's dual distribution scheme violated section 1 of the Sherman Act, 15 U.S.C. § 1, and that Hearst had combined in a price-fixing conspiracy. Blankenship sought treble damages under the Clayton Act, 15 U.S.C. § 15, in addition to injunctive relief under both causes of action.

The trial of this case began September 18, 1973, before the district court sitting with a jury. Immediately prior to trial the district court granted defendants' motion for judgment on the pleadings as to Blankenship's allegation that Hearst's dual distribution scheme violated section 1 of the Sherman Act, 15 U.S.C. § 1. Following the close of the trial the district court granted defendants partial judgment on this cause of action.

With respect to plaintiff's price-fixing charge the court raised the issue whether plaintiff had capacity to sue for the period prior to mid-1972 on the theory that Blankenship and the carriers were under the then existing business relationship of a partnership and plaintiff could not prosecute the case without the carriers' approval. The district court granted judgment on the pleadings for defendants on the price-fixing cause of action for the period prior to mid-1972. The trial court also sua sponte dismissed plaintiff's price-fixing theory for the period after mid-1972 on the basis that Blankenship after this time became a wholesaler who sold his products to the retailers, the boy and girl carriers, and that he had no standing to complain of price-fixing activities directed at the retail price of the newspaper.

At the conclusion of plaintiff's case, which was by now limited to the issue whether Blankenship's dealership was illegally terminated as a reprisal for his price activities, the district court granted the defendants a directed verdict on the ground that Hearst's action simply constituted a permissible refusal to deal and

arguably on the ground that Blankenship had failed to prove damages. The court granted defendants judgment on plaintiff's price-fixing combination cause of action.

Plaintiff appeals from each of these rulings. In addition, he has raised issues concerned with limitations placed by the court on his discovery and on the evidence he could introduce at trial. In Part I we will consider the district court's judgment against plaintiff on plaintiff's theory that Hearst's dual distribution scheme violated section 1 of the Sherman Act. In Part II we will discuss the district court's findings of lack of standing and capacity to sue on the price-fixing course of action. In Part III we will consider the propriety of a directed verdict on the alleged retaliatory termination of Blankenship's dealership. Finally, in Part IV appellant's additional contentions will briefly be discussed.

## I. *Exclusive Dealerships*

Plaintiff asserts that any one of three theories sustain his cause of action attacking Hearst's system of exclusive dealerships: (1) Hearst's different treatment of street and home-delivery dealers has the economic effect of excluding home-delivery dealers from the street-delivery market and is a *per se* violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (2) that Hearst's scheme of distribution was ancillary to a price-fixing conspiracy and thus was a *per se* violation of 15 U.S.C. § 1; and (3) Hearst's system was an unreasonable restraint on trade even if it was not a *per se* or an ancillary *per se* violation. Since a district court may grant judgment on the pleadings only if it clearly appears that the party is entitled to judgment, 2A J. Moore, *Federal Practice* ¶ 12.15 (2d ed. 1974); *see Anderson v. American Automobile Association,* 454 F.2d 1240, 1242 (9th Cir. 1972) (standard for review of summary judgment in antitrust case), the court must be reversed if any of these grounds is valid.

## A. *Per Se Illegality*

■ Appellant's argument here is that it is *per se* illegal for a manufacturer to charge a lower price and give other benefits to one set of distributors and to deny those benefits to another set of distributors because the economic realities of such an arrangement are as if Hearst had expressly prohibited the home-delivery dealer from selling in the street-delivery market. *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), established that a manufacturer could not prevent a distributor or retailer of his product from selling that product to whomever he wished once the manufacturer yielded ownership to the distributor or retailer. *Id.* at 378, 87 S.Ct. 1856. On the facts as pleaded there is no allegation of any Hearst overt limitations on plaintiff's ability to sell in the street-delivery market. Plaintiff does not allege receiving any threats as a result of his overtures at entering the street-delivery market. *Schwinn* did, however, expressly permit a manufacturer to sell his product to a dealer on an exclusive basis within a designated geographic area. *Id.* at 376, 87 S.Ct. 1856. That is, the manufacturer was allowed to sell to one dealer and that dealer alone per geographic section as long as the manufacturer took no steps to ensure that the dealers confined their sales to the geographic area or a certain set of customers. On the facts as alleged Hearst's arrangement is more reasonably analyzed as two sets of overlapping exclusive dealership systems rather than a set of constraints on one system to prevent it from competing with the other. Hearst is marketing, in effect, a home-delivered newspaper and a street-delivered newspaper. Such a system by itself does not restrain the alienability of the product Blankenship purchased which was the evil *Schwinn* opposed. In effect, Blankenship has been denied a street-dealership, an option permitted Hearst by *Schwinn.* Plaintiff did not present a case for a *per se* violation.[1]

---

1. *Schwinn's* approval of exclusive dealerships carried the caveat that they were permissible

"if competitive products are readily available to others. . . . " 388 U.S. at 376, 87 S.Ct.

## B. *Ancillary Per Se Illegality*

■ Plaintiff argues that there should not have been judgment on the pleadings because the distribution scheme could be condemned as "ancillary to the price-fixing." *Schwinn, supra* at 375, 87 S.Ct. 1856; *United States v. White Motor Co.,* 372 U.S. 253, 260, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). In *Schwinn* the Court at several points indicated that an exclusive arrangement was subject to attack if it was part of a system of price-fixing. 388 U.S. at 373, 375, 381, 87 S.Ct. 1856. Indeed, the Court suggested that an exclusive dealer system might be attacked even if the alleged price-fixing amounted to something less than actual price-fixing. *Id.* at 373, 87 S.Ct. 1856.

In his verified complaint Blankenship had alleged "[T]hat at all material times Hearst has sold the *Los Angeles Herald-Examiner* to *Los Angeles Herald-Examiner* street sale dealers (who sell the *Herald-Examiner* within Blankenship's area) at prices below the price at which Hearst has sold the *Los Angeles Herald-Examiner* to Blankenship. As a result of said economic disadvantages, Blankenship is prevented from selling the *Herald-Examiner* on streets and through retail outlets." Blankenship also alleged other acts of economic discrimination by Hearst against him and in favor of street sale dealers.

In *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 382, 87 S.Ct. 1856, 1867, 18 L.Ed.2d 1249 (1967), the Court pointed out that:

"Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act."

It would seem clear that the plaintiff might well be able to adduce evidence which would tend to show that by selling to street sale dealers within his territory at a lower price than to him, Hearst foreclosed Blankenship economically from competing with street sale dealers. According to the facts as they might have been developed this could well have been a customer restriction ancillary to price-fixing under *Schwinn* and the cases following *Schwinn*. It was error for the district court to deny plaintiff an opportunity to prove that Hearst's distribution system was ancillary to price-fixing.

## C. *Unreasonable Restraint of Trade*

■ The district court was also in error in dismissing the second cause of action of the complaint, because it is possible that plaintiff could have demonstrated the unreasonableness of the restraint on trade imposed by the exclusive dealership arrangement for street sellers. In *Anderson v. American Automobile Association,* 454 F.2d 1240, 1242 (9th Cir. 1972), this court stated:

"If under any reasonable construction of the evidence and any acceptable theory of law Anderson could be entitled to prevail, a summary judgment against him cannot be sustained."

One possible theory, as suggested by the *Schwinn* opinion could be that the exclusive dealership for street sales was unreasonable in view of possible limited inter-brand newspaper competition.[2] Another could be that it was unreasonable in light of some or all of the factors detailed in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238–39, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Finally, it

at 1864. Plaintiff did not allege that the distribution scheme should be condemned because there are not "other and equivalent brands" on the market produced by Hearst's competitors. Rather, he argued that the special incentives available to exclusive street-delivery dealers not given to Blankenship constitutes a prohibition by Hearst of Blankenship's selling newspapers in the street-delivery market. Since we reverse the district court's judgment on the pleadings on other grounds, on remand the plaintiff should be permitted to pursue this contention if he so chooses.

2. *See* note 1 *supra.*

might have been unreasonable for the reasons stated in consideration of ancillary *per se* illegality under Section B, *supra*.

Hearst was not clearly entitled to judgment on the pleadings as a matter of law on plaintiff's attack on the distribution system.

## II. *Price-fixing*

### A. *The Partnership Theory as a Bar to Capacity to Sue*

The district court was in error in finding that plaintiff lacked capacity to sue for the period prior to May-June 1972, on the theory that plaintiff and his carriers were in a partnership and only a partnership could bring the suit.

■■ The theory of limited capacity to sue for partners is based on California law as incorporated by reference in Rule 17(b) of the Federal Rules of Civil Procedure. Under California law the failure to raise at the outset of a case an objection to a plaintiff's alleged lack of capacity to sue is a waiver. *Leh v. General Petroleum Corp.,* 165 F.Supp. 933 (S.D. Cal.1958). In this case the issue was raised after the commencement of the trial.

■ In addition, the evidence relied upon by the court to find a partnership was insufficient. For the period in question the carriers made collections from the subscribers, kept 20 percent of the gross proceeds, gave Blankenship 80 percent of the proceeds, and if a subscriber failed to pay his bill did not have to pay Blankenship the amount owed. This was apparently the evidence relied upon by the court. Under California law the sharing of gross returns does not alone establish a partnership. Cal.Corp.Code § 15007(3). The relationship in the instant case, in fact, shares few of the attributes of partnership. The carriers had no community of interest with one another; they had no management role; they did not share in each other's profits or losses; they did not share in Blankenship's risks except to the limited extent of losing their profit if a subscriber

failed to pay; there was no writing between Blankenship and the carriers indicating a partnership. *See Constans v. Ross,* 106 Cal.App.2d 381, 386, 388–89, 235 P.2d 113, 116, 117–18 (C.A.1951). In fact, a minor could not legally be a partner in California since a minor cannot delegate power, Cal.Civil Code § 33, and a delegation by a partner to the other partners is required, Cal.Corp.Code § 15009.

### B. *Standing by Wholesaler on Retail Price-fixing*

After mid-1972 Blankenship altered his previous 80 percent—20 percent division of gross proceeds with his carriers and began selling the newspapers outright to the carriers. Appellees argued before the district court and argue here that the only allegations in the complaint were that they attempted to fix the *retail* price of the paper; that there were no allegations nor evidence that Hearst fixed appellant's *resale* price; therefore, since retail sales would be the "affected area of the economy," the claimed injury to appellant occurred entirely outside that area and standing must be denied. The district court held that Blankenship had no standing to complain about Hearst's alleged price-fixing after mid-1972.

*Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952), established the rule in this circuit that a plaintiff in order to demonstrate standing under the antitrust laws must show that his business was "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Id.* at 55. The court found the plaintiff labor unions and its members to have suffered nonrecoverable "incidental" damages from an alleged conspiracy to drive certain movie production companies which employed none of the union members out of business. *Id.* at 54.

■ The court reembraced the "target area" approach in *In re Multi-district Vehicle Air Pollution M.D.L. No. 31,* 481

F.2d 122 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). Under the two-step approach suggested, there must first be an identification of the affected area of the economy which is the target of the alleged anticompetitive conduct. Second, it must be determined whether the alleged injury was within that area. *Id.* at 129. Blankenship argues that Hearst sought to control the retail price of the newspaper by means directed at Blankenship and other dealers. He details alleged activities by Hearst directed at the dealers which were designed to affect their influence over the prices charged by the carriers.

 In order to define the proper limits of the target "area of the economy" one determines what area "could reasonably be foreseen would be affected" by the alleged illegal activity. *Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073, 1076 (9th Cir. 1970), *cert. denied,* 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358, 362 (9th Cir. 1955). It would appear in the instant case that Hearst could reasonably foresee that efforts directed at dealers to have the dealers influence their carriers as part of a scheme to control the retail price would affect the dealers. The price the dealers could charge the carriers and thus the dealers' profits were here directly ,affected by any change in retail price; a fixed retail price would prevent the dealers from charging the carriers a higher price.

In addition, the facts of this case as alleged, taking a view favorable to appellant, constitute resale price maintenance. In the fall of 1971 Robert McKinney, a division manager, made a statement to Blankenship that Hearst would not permit any subscriber to pay more than $36 a year or $3 a month for the paper. In his letter of August 29, 1972, appellee Myers demanded that Blankenship and the other dealers "agree not to increase or decrease the price of the newspaper as stipulated." By the statement of 1971 appellees commanded that retail prices be fixed, and by the letter of 1972 they directed both the minimum and the maximum prices that could be charged to the subscribers. The necessary predicate of both the statement and the letter in view of the pressure by Blankenship and other dealers for higher prices was that the dealers' resale pricing discretion was to be severely circumscribed by the dealers' duty to maintain the retail price.

As the Court said in *Albrecht v. Herald Co.,* 390 U.S. 145, 153, 88 S.Ct. 869, 873, 19 L.Ed.2d 998 (1968):

"Maximum price fixing may channel distribution through a few large or specifically advantaged dealers who otherwise would be subject to significant nonprice competition. Moreover, if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual cost of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices. It is our view, therefore, that the combination formed by the respondent in this case to force petitioner to maintain a specified price for the resale of the newspapers which he had purchased from respondent constituted, without more, an illegal restraint of trade under § 1 of the Sherman Act." (Footnote omitted.)

The fixing of maximum retail prices here had the inevitable effect of also fixing or illegally restraining the resale pricing of the wholesalers.

Therefore, under both approaches discussed above Blankenship's pricing activities were within the target of Hearst's retail price-fixing scheme, and the alleged injury was within that target area. A breakdown of the competitive process at the retail level achieved by Hearst's control of retail prices would endanger the dealers' price-making autonomy as well as the retailers'. *See Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51, 54–55 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). Blankenship was not incidentally injured. *Id.* at 54. He had standing to

contest Hearst's alleged price-fixing both because the foreseeable result would be to affect the dealers and because that effect constitutes resale price maintenance.

### III. Termination of Dealership

The district court granted defendants a directed verdict on the issue whether Hearst's termination of plaintiff was illegal because pursuant to a combination or conspiracy. The court found that Hearst's actions constituted a refusal to deal as permitted by *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

In *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1139–40 (9th Cir. 1974), this court articulated the standard in directing a verdict:

"As appellant reminds us, the Supreme Court has admonished that summary procedures, including directed verdicts, should be used 'sparingly in complex antitrust litigation where motive and intent play leading roles . . . .' *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *accord,* Cornwell Quality Tools Co. v. C.T.S. Co., 446 F.2d 825, 832 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972). Nevertheless, if an antitrust plaintiff, as well as any other plaintiff, does not present enough evidence within his case-in-chief to support a reasonable finding in his favor, a district court has a duty to direct a verdict in favor of the opposing party. *Brady v. Southern Ry.*, 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Washington v. United States*, 214 F.2d 33, 41 (9th Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954). When considering the propriety of the grant or denial of a motion for directed verdict, the correct standard is whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the non-moving party. *Butte Copper & Zinc Co. v. Amerman*, 157 F.2d 457, 458 (9th Cir. 1946). 'Substantial evidence is more than a mere scintilla.' *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Butte Copper & Zinc Co., supra.* The evidence must be examined in a light most favorable to the nonmovant. *Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 & n.6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and there can be no weighing of evidence. *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Finally, appellant here is entitled to the benefit of all *reasonable* inferences that may be drawn from its evidence. *Standard Oil Co. v. Moore*, 251 F.2d 188, 198 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958)." (Footnote omitted.)

Under the facts as alleged Hearst officials on several occasions advised Blankenship and others as to what would be proper retail prices. For a time Blankenship cooperated. On January 1, 1973, Blankenship increased his resale price and suggested to his carriers a corresponding increase in retail prices in excess of the schedule suggested by Hearst. Blankenship was terminated 6 weeks later under conditions that might lead to an inference that he was being punished for his pricing decision.

 Had Hearst, solely been concerned with the resale price Blankenship charged, an announcement of a suggested resale price and a subsequent termination for failure to adhere to that price would arguably be the type of activity, announcement and refusal to deal, permitted by *United States v. Colgate & Co.,* as modified by *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). But here Hearst allegedly enlisted at least Blankenship and perhaps all the other dealers in a combination to fix retail prices by means, apparently, of their leverage over

their boy and girl carriers. It is a possible inference that Hearst maintained this combination by the technique of refusal to deal. A manufacturer may not use his wholesalers to bring his retailers into price line. *Parke, Davis, supra* at 45–46, 80 S.Ct. 503. A combination of Hearst, Blankenship and the other home-delivery dealers to control the retail price of the retailers-carriers would be unlawful. But so would a combination of Hearst and Blankenship alone also be an unlawful combination. The price discussions between Blankenship and McKinney in the fall of 1971, and Blankenship's adherence to McKinney's wishes subsequently would arguably create an inference that Blankenship and Hearst had an implied agreement to control the retail price of the paper. *Albrecht v. Herald Co.,* 390 U.S. 145, 150 n.6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1140 n.6 (9th Cir. 1974). *See generally Theatre Enterprises v. Paramount,* 346 U.S. 537, 540–41, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Furthermore, Blankenship's adherence to the prices in the August 1972 letter for retail rates is additional proof of a combination to control retail prices. Therefore, Hearst's termination of Blankenship if done in order to maintain the retail price-fixing does not qualify for the *Colgate* refusal to deal treatment. Appellant was entitled to have the jury make this determination.

■ Defendant's additional contention that a jury could not reasonably believe that the termination was retaliation for Blankenship's failure to follow the price line is without merit. Given the award to Blankenship, the praise he received from his superior, the fact that the termination was not handled in the normal channels, and the fact that Myers, the circulation director, who also wrote the price control letter of August 1972, did the terminating—these facts could reasonably imply that the termination was retaliation. Defendants' theory that the termination was because of a sharp drop in Blankenship's circulation because of his higher prices and his mismanagement is an argument to be weighed by the jury against Blankenship's version of the facts.

■ Defendants' use of *Chisholm Bros. Farm Equipment Co. v. International Harvester Co., supra,* is inapposite. In that case the dispute involved proving a Sherman Act agreement by means of proof of coercion and concerted action by several parties other than plaintiff. Here, sufficient agreement is shown by Hearst's several directives and plaintiff's acquiescence. *Id.* at 1140 n.6. The proof is much more direct here.

Defendants' last argument in support of the directed verdict is that plaintiff presented insufficient evidence on the issue of damages caused by termination. It is unclear whether the district court directed a verdict for defendants partly on this basis. In his exchange with plaintiff's counsel the trial judge indicated that insufficient proof of damages had been produced, R.T. 642–44, but when he rendered his judgment he stated as his reason the lack of proof of Blankenship's participation in a combination. R.T. 673–74. Appellant had attempted to introduce evidence of the value of a dealership for the *Sacramento Union* newspaper, but its introduction was refused because of an alleged failure to demonstrate foundation. Appellant also offered to testify himself to the value of the dealership. This offer was again declined because of an alleged insufficient foundation. Appellant did succeed in having admitted into evidence testimony of Myers, circulation director, as to a valuation formula the *Herald-Examiner* used for dealerships. The trial court indicated that this might be competent evidence of value in a colloquy with defense counsel on defense counsel's motion for a directed verdict. R.T. 641. From these facts it is not possible to say that the trial court directed a verdict on the basis of damages as defendants claim. The jury did have before it the Myers formula and exhibits

from which a value could have been reached.

## IV. *Additional Issues*

### A. *Discovery*

During the discovery phase of this proceeding the district court in response to a motion by defendants ordered plaintiff not to depose George Hearst, publisher of the *Herald-Examiner*. The court granted the protective order requested pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. On appeal plaintiff asserts that he sought the discovery in order to learn about the newspaper's alleged price-fixing policies. In addition, plaintiff suggests that George Hearst was one of the active leaders of the newspaper and may have had knowledge about the August 29, 1972 letter from circulation director Myers to the dealers urging that they hold the line on retail prices. Defendants' sole objection to the deposition is that what George Hearst had to offer would be repetitious with what plaintiff had learned from other sources. Appellees' Brief at 40. Plaintiff countered, however, by suggesting possible information that George Hearst might have that others did not. Appellants' Brief at 59–60.

> Rule 26(c) provides in pertinent part:
> "Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . ."

"All motions under these subparagraphs of the rule must be supported by 'good cause' and a strong showing is required before a party will be denied entirely the right to take a deposition." 4 J. Moore, *Federal Practice* ¶ 26.69 at pp. 26–494—26–495 (2d ed. 1974). Under the liberal discovery principles of the Federal Rules defendants were required to carry a heavy burden of showing why discovery was denied. They did not meet this burden. On remand plaintiff, in the absence of a better showing, should be permitted to proceed with this deposition. In addition, the district court should reconsider its denial of plaintiff's motion for production of various documents in the light of this opinion.

### B. *Admission of Evidence at Trial*

Blankenship argues that the trial court erred in refusing to permit the introduction of various items of evidence. First, plaintiff was not permitted to introduce evidence on the price Blankenship paid Hearst for the newspapers. Since Blankenship, a wholesaler, had standing to complain of retail price-fixing in which he played an allegedly unwilling part in a combination with Hearst and since the wholesaler's damages were within the target of the retail price-fixing scheme, then this item of proof would be relevant to proving this allegation and should have been admitted.

Appellant complains of the refusal of the trial court to admit other evidence offered by him. The trial court's discretion in this area is necessarily broad. *Trans-Car Purchasing, Inc. v. Summit Fidelity & Surety Co.*, 454 F.2d 788, 792 (7th Cir. 1971). But in view of the disposition made it becomes unnecessary to rule upon evidentiary questions.

We, of course, express no opinion on whether the facts alleged by Blankenship are true.

The judgment of the district court is reversed and the cause remanded for a new trial.