**AMERICAN MOTOR INNS, INC.**

v.

**HOLIDAY INNS, INC., Appellant,**

**International Association of Holiday Inns, Intervenor-Defendant.**

**No. 74–1911.**

United States Court of Appeals, Third Circuit.

Argued March 3, 1975.

Decided June 30, 1975.

---

1232

Donovan, Leisure, Newton & Irvine, New York City, Pitney, Hardin & Kipp, Newark, N. J., for appellee; Sanford M. Litvack, Paul A. Alexis, Clyde A. Szuch, Newark, N. J., of counsel.

David Berger, P. A., Warren D. Mulloy, Bruce K. Cohen, Warren Rubin, Philadelphia, Pa., Harold Brown, Brown & Leighton, Boston, Mass., for Frank L. Hawkins.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellant; Milton Handler, Fred A. Freund, Elizabeth Head, Richard M. Steuer, New York City, of counsel.

Lowenstein, Sandler, Brochin, Kohl & Fisher, Newark, N. J., Murray J. Laulicht, Newark, N. J., on the brief, for amicus curiae International Ass'n Holiday Inns.

Before HASTIE, ADAMS and WEIS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The largest chain of motor hotels in the nation is operated under the Holiday Inn trademark. Holiday Inns, Inc. (HI), the owner of the trademark, not only licenses the trademark to franchisees who wish to operate Holiday Inns at specified sites, but also owns and manages a number of inns itself. American Motor Inns, Inc. (AMI), HI's largest franchisee, operates 48 Holiday Inns. The antitrust suit which forms the basis for the present appeal was precipitated by HI's denial of AMI's application for a franchise to open a Holiday Inn adjacent to the new passenger terminal at the Newark, New Jersey airport. Pursuant to the terms of its standard licensing agreement, HI also refused to allow AMI to build any other type hotel at the Newark location.

AMI charged in its complaint that HI's franchising practices resulted in a horizontal allocation of the hotel-motel market among HI and its franchisees in violation of the Sherman Act. The district court, sitting without a jury, concluded that HI had transgressed the law.

This appeal by HI from the judgment in favor of AMI raises several important issues regarding the application of section 1 of the Sherman Act[1] in the setting of a franchise arrangement:

1. Did the district court err in finding that HI had unlawfully conspired with one or more of its existing franchisees in the Newark vicinity to restrain trade unreasonably when AMI's application for a Holiday Inn franchise at the Newark airport was denied?

2. Did the district court err by misleading HI into believing that the suit involved only the denial of AMI's Newark application rather than a challenge to the national operation of HI's procedures for granting franchise applications?[2]

3. Does HI unreasonably restrain trade by requiring that its franchisees not operate any hotels or motels which are not franchised by HI?

4. Does the combination of three characteristics of the Holiday Inns franchising system—the "radius letter" practice; the prohibition on franchisees' operation of non-Holiday Inns; and HI's alleged practice of permitting only parent company-owned inns to be established in specified towns—constitute an unreasonable restraint of trade?

## A. THE DISTRICT COURT OPINION.

The trial judge found that on December 31, 1972 the Holiday Inns system consisted of 1380 Holiday Inns throughout the country. HI and its subsidiaries owned or operated 281 of these Inns. The remaining 1099 were owned by independent parties who operated the motor lodges pursuant to franchise agreements with HI, which licensed the franchisee to use the Holiday Inn trademark.

At the time of the district court's decision, AMI, in addition to operating 48 Holiday Inns, had licenses to build eight inns and commitments from HI for five additional franchises.

Prior to trial the International Association of Holiday Inns was permitted by the trial court to intervene as a defend-

---

1. AMI's complaint originally alleged violations of section 2 of the Sherman Act as well, but those charges were dropped before trial.

2. Because of our disposition of this issue, we need not decide the further issue raised by HI, whether HI's franchising procedures as they are practiced nationally, operate as an unreasonable restraint of trade.

ant. The membership of the Association is composed of all the Holiday Inns, whether franchised or operated by HI. The Association was, on its own motion, dismissed as a defendant at the close of AMI's case, but was allowed to continue to participate in the proceedings as an amicus curiae.

After the parties agreed to a bifurcated trial, the court conducted proceedings on the issue of liability. Following a decision which concluded that HI was liable to AMI, the parties stipulated to treble damages in the amount of $4 million, plus attorneys fees and costs. In addition, both sides agreed to equitable relief including a declaratory judgment that the clause in HI's standard licensing agreement barring HI franchisees from owning non-Holiday Inns [3] was unlawful; an injunction against enforcement of that clause by HI; and an injunction against HI's soliciting comments or objections from its existing franchisees when considering an application for a *new franchise*.

1. *AMI's Application for a Franchise at Newark Airport and the Operation of the Radius Letter Procedure*

The events which provided the impetus for this litigation between HI and AMI began with AMI's application for a franchise to open a Holiday Inn near the Newark airport. In February, 1971 the City of Elizabeth, New Jersey invited bids for the purchase of a parcel of land close to the proposed site of a new terminal at the Newark airport. AMI submitted the highest bid, and in December, 1971, received a deed for the property, subject to the condition that $1 million worth of construction on a hotel-motel complex be completed at the location within eighteen months. AMI then applied to HI for a license to operate a Holiday Inn on the Elizabeth property.

The normal HI procedure upon receiving an application for a franchise was to send written notices of the application—referred to as radius letters—to at least the three Holiday Inns nearest the proposed location. The recipients of the radius letters were invited to forward to HI their written comments on the application, but were under no obligation to respond. Any replies to the radius letters received by HI were referred to the Franchise Committee, which then reviewed the application.

Ordinarily HI's Franchise Committee had the authority to grant or to deny any franchise application. However, the district court found that if, as a result of the radius letters, HI received an objection to the proposed franchise by an existing franchisee, the only definitive action the Franchise Committee could take was to deny the application. It could not approve the application. Once an objection had been lodged, the franchise could be awarded only by the Executive Committee of the Board of Directors of HI. According to the trial judge, in order for the Executive Committee to consider an objection by any existing franchisee, the Franchise Committee must already have recommended that the franchise be granted. In 1972 the Executive Committee reviewed 75 applications for franchises to which one or more existing franchisees had objected, and denied 43 of them. The trial court found as a fact that "these 43 applications would have been granted but for objections from existing franchisees." [4]

With regard to AMI's application for a franchise for the Elizabeth property, HI sent radius letters to its licensees in downtown Newark and Carteret, New Jersey, as well as to Arthur and Edwin Fleck, the holders of a franchise for a Holiday Inn near the existing passenger terminal at the Newark airport. The Flecks' motel was approximately 1.25 miles from the AMI property. The

3. The non-Holiday Inn clause provides:

" . . . Licensee will not, directly or indirectly own any interest in, operate, or be in any manner connected or associated with

any inn, hotel or motel during the period of this license, except Holiday Inns."

4. *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 365 F.Supp. 1073, 1079 (D.N.J.1973).

Flecks previously had plans to expand their own inn, and, prior to AMI's acquisition of the Elizabeth property, had notified HI that they were interested in building another Holiday Inn on the property eventually purchased by AMI. Indeed, the Flecks submitted a bid for that specific property, but were outbid by AMI.

The Carteret franchisee and the Flecks advised HI that they opposed the grant of AMI's application. The district court found that the objections of the Flecks and the Carteret licensee "were dispositive to the [Franchise] Committee",[5] and the Committee rejected AMI's application. HI informed AMI of the denial of its request for the franchise, noting that AMI's proposed inn would have been in competition with the Fleck's existing inn. In discussing with AMI the alternatives available in light of the rejection of the application, the Chairman of the Board of HI recommended that AMI contact the Flecks "to try to 'work something out with them,'" adding later that if AMI and the Flecks "were able to make a deal",[6] HI would be satisfied. After consideration of this evidence the trial judge decided that "AMI's application for a franchise located on the [Elizabeth] property was rejected because of Fleck's [sic] objections, which were treated as a veto by HI."[7]

After the denial of its request for a Holiday Inn license, AMI sought to have HI waive the non-Holiday Inn clauses in AMI's existing licenses to enable AMI to build a Sheraton Inn on the Elizabeth site. HI refused.

With respect to the events surrounding AMI's request for a license to construct a Holiday Inn on the Elizabeth property, the district court concluded that the denial of the application was the result of a combination or conspiracy to allocate territories among competitors. The trial court considered that combination or conspiracy to be essentially horizontal in character, and therefore an unreasonable restraint of trade repugnant to the Sherman Act.

The district court also determined that HI's radius letter policy, as it operated nationally, created in effect a horizontal allocation of territories among competitors, thereby contravening section 1 of the Sherman Act.

2. *The Advance Reservation System and the Restriction on Franchisees' Ownership of Non-Holiday Inn Motor Hotels*

HI and its franchisees operate a free advance-reservation system which enables the traveler to make a reservation from any Holiday Inn to any other Holiday Inn. Since 1965 such reservations and referrals have been handled by means of the computerized Holidex system. That system links every Holiday Inn in North America to a central computer. Through the computer, reservations may be made and confirmed from one Holiday Inn to another, as well as from a number of reservation offices to the inns. Furthermore, when the computer cannot confirm a reservation at a particular inn, it reflects any space available at the Holiday Inns nearest the desired location.

Each inn must have a Holidex terminal in operation 24 hours a day. The costs of operating the Holidex system are borne by the individual inns, through installation charges and a monthly fee that is based on the number of rooms at each inn served by the system. In exchange for these payments an inn may receive—through the computer—reservations referred from the other inns, from reservation offices, or from Holidex terminals located in the offices of several major corporations.

The district court found that the reservation referral concept had been "very important to the growth and success of the Holiday Inn System."[8] For the three years between January, 1970 and December 31, 1972, approximately 30 to

---

5. *Id.* at 1086.

6. *Id.* at 1087.

7. *Id.*

8. *Id.* at 1078.

38% of the total occupancy of all Holiday Inns originated through Holidex, and reservations made by one inn for another inn accounted for 21.4% of total occupancy.

Each Holiday Inn franchise agreement now requires the licensee "to use every reasonable means to encourage use of 'Holiday Inns' on a national basis by the traveling public." To this end, the Holiday Inn franchise agreement has, since 1958, provided that the franchisee may not directly or indirectly own or operate any hotel, motel or motor inn which is not a Holiday Inn. This is referred to as the "non-Holiday Inn clause." There are no restrictions, however, on a former franchisee's ownership of non-Holiday Inns as soon as the franchisee has relinquished all the licenses it has received from HI. HI contended in the district court, as it does here, that the non-Holiday Inn clause is necessary in order to preserve the viability of the inn-to-inn referral system.

The trial judge found that between 1953 and 1958 each franchise agreement conferred upon the franchisee an exclusive license within a specified geographic area, and the "best efforts" clause and the "non-Holiday Inn" clause were limited in their effect to that specific locale. Since 1958, Holiday Inn franchise agreements no longer grant exclusive territories.

In 1957 or 1958, however, HI became disturbed over an incident involving a franchisee who utilized his Holiday Inn to promote his own non-franchised motel rather than the Holiday Inn near that motel. Albert Pick operated not only five or six Holiday Inns but also several non-Holiday Inn motels. An inspector from HI found pamphlets at one of Pick's Holiday Inns which advertised Pick's motel in Montgomery, Alabama rather than the Holiday Inn located in that city, that Pick did not own. HI subsequently extended the non-Holiday Inn and the best-efforts clauses to apply to the Holiday Inn system nationwide, rather than merely to the geographic area in which a franchisee's Holiday Inn is located.

The best efforts clause of the Holiday Inn franchise agreement was interpreted by the trial judge to impose on the licensee the obligation to refer the customers of his Holiday Inn to the other Holiday Inns throughout the country rather than to any non-Holiday Inn, whether owned by the licensee or not. Thus, if an individual owned a Holiday Inn in Philadelphia and a non-Holiday Inn in New York City, he would, according to the trial judge, be required by the best-efforts clause to refer the customer of his Philadelphia Holiday Inn to the Holiday Inn in New York rather than to his own New York City motor lodge. HI claimed that, although the best efforts clause imposed that obligation on the franchisee, the duty was difficult to enforce in the absence of the non-Holiday Inn clause, which removed any financial incentive to violate that obligation. The trial judge found, however, that the two clauses were equally troublesome to enforce. Furthermore, the district court determined that, in this modern age, non-computerized reservations systems are too costly and inefficient to be practicable, that the Holiday Inn franchisees were precluded from having on the Holiday Inn premises any reservation system or computer terminal other than Holidex, and that such prohibition is readily enforceable by HI's periodic inspections.

Other hotel-motel chains or referral groups, the district court found, do not place nationwide restrictions on their franchisees' ability to own hotels or motels not licensed by the respective groups. Instead, according to the trial court, other trademark licensors merely preclude their franchisees from owning motor lodges not operated under that trademark within a limited distance from the franchisee's licensed establishment.[9] Alternatively, some chains pro-

9. Howard Johnson franchise agreements, for instance, stipulate that the licensee may not own any non-Howard Johnson Lodge within 25 miles of the licensee's Howard Johnson facility.

hibit their members from operating motor hotels under other trademarks without the licensor's consent, but the licensor contracts not to withhold its consent unreasonably.

The effect of the non-Holiday Inn clause, according to the trial judge, "is the intended one of reducing and preventing competition among Holiday Inn franchisees and between franchised inns" and those owned and operated by HI itself.[10] Protection of the reservation-referral system, the court decided, "was and is available through other other provisions of its contract . . . , and was and is available through less restrictive provisions of the type utilized by other national hostelers."[11]

The trial judge concluded that the non-Holiday Inn clause was an unreasonable restraint of trade. He reasoned that the Holidex referral system could be adequately protected without a device so restrictive of competition as the non-Holiday Inn clause. That clause, according to the district court, resulted in a foreclosure of all competing hotel chains and referral systems from doing any business with any Holiday Inn franchisee. Moreover, the court stated, " '[E]ven otherwise reasonable trade arrangements must fall if conceived to achieve forbidden ends.' "[12] The trial judge in this regard appears to have believed that the non-Holiday Inn clause was illegal because he had found that it was adopted in order to prevent competition among franchisees and between franchisees and company-owned inns. Thus the district court held that the non-Holiday Inn clause was an unreasonable restraint of trade which affronted section 1 of the Sherman Act.

▮ HI asserted as a defense that the clause in question was, in effect,

merely an exclusive dealing contract. The parties agreed that all exclusive dealing agreements must comply with the standards of section 1 of the Sherman Act. In addition, if the contract involves the sale or lease of goods, a lawful exclusive dealing agreement must also satisfy the more rigorous standards of section 3 of the Clayton Act.[13] The parties further agreed that although the Clayton Act is not applicable to the non-Holiday Inn clause because no goods were involved, if the clause did not infringe upon the stiffer standards of anticompetitiveness under the Clayton Act, it would, a fortiori, be lawful under the less restrictive provisions of the Sherman Act.[14]

The trial judge, who assumed arguendo that the clause is an exclusive dealing agreement, declared, however, that as an exclusive dealing agreement, the non-Holiday Inn clause does not comply with the Clayton Act's standard for lawfulness because it forecloses competitors of HI from dealing with 14.7% of the relevant market.[15] Therefore, the court concluded "[s]ince wholly apart from the exclusive dealing analysis I have held above that the non-Holiday Inn clause violates Section 1 [of the Sherman Act], if I were to hold the clause to constitute an exclusive dealing arrangement, it would still violate Section 1."[16]

### 3. Parent-Company Towns.

The district court also found that HI has been following a general practice of not granting franchises in the 152 cities in which the 281 HI-owned inns are located. "[A] significant number of cities are 'parent company towns' in which franchisees may not compete with company-owned inns by building a Holiday Inn or [because of the non-Holiday Inn clause] a non-Holiday Inn."[17] AMI had

10. 365 F.Supp. at 1084.

11. *Id.*

12. *Id.* at 1094, quoting *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

13. 15 U.S.C. § 14.

14. *See Standard Oil Co. v. United States,* 337 U.S. 293, 312, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

15. 365 F.Supp. at 1097.

16. *Id.*

17. *Id.* at 1080.

applied for franchises to operate Holiday Inns in several of these "company towns," [18] but its requests were denied in spite of a need, according to the trial judge, for additional motels in those areas.

The district court concluded that the company-town policy in itself was not unlawful. Because the policy was unilaterally imposed by HI, there was, according to the trial judge, no "conspiracy," no "contract" and no "combination." However, the aggregate of the company-town policy together with the radius letter policy and the non-Holiday Inn clause resulted, in the words of the trial judge, in "a horizontal allocation of territories." This is so, the trial court stated, because the radius letter policy and the company town policy prevent Holiday Inns, whether owned by franchisees or by HI, from competing with one another, while the non-Holiday Inn clause prevents HI's franchisees from competing with one another or with the parent company by opening a motor hotel not franchised by HI.

### 4. *Damages and Injunctive Relief.*

After the district court's decision on liability, the parties stipulated to treble damages in the amount of $4 million. In addition, the final judgment of the court provided for injunctive relief which had also been agreed upon by HI and AMI following the court's liability determination. The injunctive relief included a permanent restraint on HI's enforcing the non-Holiday Inn clause against any of its franchisees and a permanent restraint on HI's soliciting from its franchisees comments on applications for new franchises. HI was also directed to grant AMI's application for a franchise at the Newark airport.

### B. CONTENTIONS ON APPEAL.

#### 1. *By HI.*

On this appeal HI contends, in effect, that the evidence introduced at trial was no sufficient to support the district court's finding that HI denied AMI's Elizabeth application because it was opposed by the existing franchisees in the area. Rather, HI insists here, as it did in the trial court, that HI in fact refused to grant the license in an exercise of its independent business judgment. Moreover, HI asserts, even if it were influenced by the Flecks' objections, HI's actions amounted to nothing more than granting the Flecks the lawful status of an exclusive representative of HI in the Newark airport area.

With respect to the trial court's determination that the operation of the radius letter policy constitutes nationally a horizontal allocation of territories among competitors, HI claims that it was foreclosed from fully litigating that issue. When HI attempted to present evidence on the use of the radius letter nationally, both AMI and the trial judge, according to HI, repeatedly stated that such issue was no longer in the case. In addition, HI argues with respect to this issue, as it does regarding the alleged Newark conspiracy, that HI, after receiving any objection from a franchisee, in fact made an independent decision on the merits of the license application.

HI also maintains that the district court erred as a matter of law in concluding that the restraint of trade effected by the non-Holiday Inn clause is an unreasonable one and therefore an unlawful one. The trial judge did not, according to HI, conduct the full rule of reason inquiry into the circumstances surrounding that clause which has been mandated by the Supreme Court in such cases. HI argues that the district court failed to consider, as it should have, the effect of the non-Holiday Inn clause upon the hotel-motel industry at large. There was no showing at the trial, HI contends, that the challenged clause has an anti-competitive impact on either the competitors of HI or those of HI's franchisees.

---

**18.** The "company towns" in which AMI applied for a franchise include: Flint, Michigan; Knoxville, Tennessee; Fort Worth, Texas; Columbus, Georgia; Tulsa, Oklahoma; Chicago, Illinois; New Orleans, Louisiana; and Saratoga Springs, New York.

The district court was also mistaken, HI urges, in finding that the inn-to-inn reservation-referral system could be adequately protected by the less restrictive alternative clauses cited by the trial judge. In addition, HI protests that the district court's decision is based on an incorrect ruling that the Sherman Act required that HI impose through its franchise agreements only the most minimal restriction on competition among its licensees capable of protecting the referral system.

HI further declares that the non-Holiday Inn clause is merely an exclusive-dealing agreement which is lawful not only under the applicable Sherman Act standards but also under the stricter Clayton Act test explicated in *Tampa Electric Co. v. Nashville Coal Co.*[19]

The trial court also erred, according to HI, in finding that HI has a "company town policy," and in concluding that the aggregation of the radius letter policy, the company town policy and the non-Holiday Inn clause resulted in a horizontal allocation of territories.

Finally, HI contends that if there has been a conspiracy to allocate the market among competitors AMI has been a participant in the conspiracy and therefore should not be awarded relief.

### 2. *By AMI.*

In response to HI's contentions, AMI avers that all of the district court's findings of fact are supported by substantial evidence. Further, AMI argues that the facts as found by the trial court are sufficient to make out an unlawful conspiracy between HI and its franchisees to exclude AMI from the Newark area. The national aspects of the radius letter policy, AMI states, were always an issue in the case, and that procedure amounts to a horizontal allocation of markets which is illegal *per se*. AMI claims that the facts considered by the trial judge are sufficient to establish that the restrictions on the operation of motor hotels other than Holiday Inns by HI's franchisees place an unreasonable restraint on competition. HI does not benefit, AMI states, by analogizing the non-Holiday Inn clause to an exclusive dealing contract. As an exclusive dealing arrangement, AMI argues, the clause does not satisfy the requirements for legality under the Clayton Act because it forecloses HI's competitors from dealing with a substantial portion of the market.

Moreover, AMI urges, the conspiracy between HI and its licensees cannot be dissected and each of its components analyzed separately without considering the overall result. The combined effect of the radius letters, the company town policy and the non-Holiday Inn clauses, AMI declares, is an illegal horizontal division of markets which prevents competition among the franchisees and between the parent company's motels and hotels owned by HI's franchisees.

### C. THE NEWARK CONSPIRACY.

On its face section 1 of the Sherman Act proscribes "[e]very contract, combination . . . or conspiracy in restraint of trade or commerce among the several States."[20] However, since almost all commercial contracts restrain trade in some degree, the courts have long interpreted the Sherman Act to prohibit only "unreasonable" restraints of trade or commerce.[21] Although the "rule of reason" requires that the courts generally give extensive consideration to the market context in which the restraint arises before pronouncing the restraint unreasonable,[22] "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively pre-

---

**19.** 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

**20.** 15 U.S.C. § 1 (1974).

**21.** *See Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Chi-* *cago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

**22.** *See Chicago Board of Trade, supra; Northern Pacific Ry. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

sumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." [23]

■ Vertically imposed restraints on the territories or markets in which a seller may offer his merchandise or services may, under some circumstances, be lawful. In *United States v. Arnold, Schwinn & Co.*,[24] for example, the Supreme Court, applying a rule of reason analysis under the Sherman Act, held that with respect to bicycles which a distributor or retailer received on consignment from Schwinn, Schwinn could assign territories to each of its distributors and require them to sell only to retailers franchised by Schwinn.[25] The Court emphasized that it was dealing with a truly vertical restraint imposed by the manufacturer, not with an allocation of markets or territories or customers by a combination of manufacturers or distributors.[26]

■ By contrast, however, because of the deleterious effects of such agreements on competition and because of the lack of economic justifications for such agreements, it is *per se* unlawful under section 1 of the Sherman Act for competitors who operate on the same level of the chain of distribution to agree among themselves on an allocation or division of markets.[27] The Supreme Court has declared:

"One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. . . . This Court has reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.' " [28]

In the present case the district court found that HI treated "as a veto" [29] the objections by its existing franchisees to AMI's application for a license at the Elizabeth location. After carefully reviewing the entire record, we cannot say that the trial judge's findings of fact in this regard are clearly erroneous.[30]

■ By thus permitting its existing franchisees to determine whether a potential competitor would be allowed to enter the Elizabeth-Newark market, HI enabled its franchisees already in the Elizabeth-Newark area to divide that market between themselves, thus precluding further intrabrand competition. Such conduct constitutes a horizontal market allocation that is a violation of the Sherman Act.

HI's treatment of the responses to the radius letters regarding AMI's Newark application is similar to the practice which the Supreme Court determined to be *per se* unlawful in *United States v. Topco Associates.*[31] There a number of

23. *Northern Pacific Ry., supra,* 356 U.S. at 5, 78 S.Ct. at 518.

24. 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

25. *See also Anderson v. American Automobile Association,* 454 F.2d 1240 (9th Cir. 1973). *Cf. White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Salco Corp. v. General Motors,* 1975 CCH Trade Reg. Rep. ¶ 60,322 (10th Cir. 1975). *But see Copper Liquor Inc. v. Adolph Coors Co.,* 506 F.2d 934 (5th Cir. 1975).

26. 388 U.S. at 378, 87 S.Ct. 1856.

27. *United States v. Addyston Pipe & Steel Co.,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199

(1951); *Fontana Aviation, Inc. v. Beech Aircraft Corp.,* 432 F.2d 1080 (7th Cir. 1970). *See Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 878 (1st Cir. 1966).

28. *United States v. Topco Assoc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), quoting from *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

29. 365 F.Supp. at 1086–87.

30. F.R.Civ.P. 52 provides in part that upon trials to the court sitting without a jury, "Findings of fact shall not be set aside unless clearly erroneous . . . ." *See Zenith Corp. v. Hazeltine,* 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

grocery chains formed Topco to manufacture a line of private-label grocery products that the member chains could then retail. Each of the participating grocers was assigned a territory in which it had the exclusive right [32] to market the Topco-label products. When an additional grocer applied for permission to market Topco-brand products, the existing member whose operations were closest to those of the applicant, or any other member within 100 miles of the applicant's stores, had a right to object to the licensing of the applicant. The power of existing members to lodge such an objection, the Supreme Court said, operated as "a veto of sorts" [33] over the approval of the application. The Court held that these features of the Topco plan constituted a horizontal restraint of trade and therefore a *per se* violation of section 1 of the Sherman Act.[34]

Concededly, HI, in the case at hand, was not created, nor is it in general controlled, by its licensees, as Topco was. Further, there are no rigidly defined territories—as in Topco—within which HI's Newark-area franchisees have the exclusive right to operate. However, according to the finder of fact here, HI treated the franchisees' objections to AMI's application as dispositive and thus allowed its licensees, like the existing Topco members, to determine whether the applicant would be allowed to compete

with them. Although there are no explicit limits on the area over which the Flecks and the Carteret franchisee exercise veto power, the radius letters from HI, together with the significance accorded to the franchisees' objections, function like the combination of the exclusivity provisions and the veto power over new members in *Topco* "effectively to insulate members from competition" under the Holiday Inn Trademark.[35]

■ HI's action in denying AMI's application, according to the trial court, was not taken unilaterally, but rather in concert with one or more of its licensees. If HI had acted independently in refusing AMI's request, such conduct might have been akin to the vertical restraints in *Schwinn*. But where, as here, the action in question is ascertained by the finder of fact to be joint or collaborative, it is sufficient to constitute a "combination or conspiracy" within the meaning of the Sherman Act.[36] In the words of Mr. Justice Burton:

> Where the circumstances are such as to warrant [the trier of fact] in finding that the [alleged] conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified.[37]

**31.** 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

**32.** "Most licenses are [explicitly] exclusive, and even those denominated 'co-extensive' or 'non-exclusive' prove to be *de facto* exclusive." 405 U.S. at 602, 92 S.Ct. at 1131.

**33.** Applications for membership in Topco normally required approval by the board of directors and by 75% of the association's members. If an objection was filed, however, an affirmative vote by 85% of the members was required. In practice, the Supreme Court said, "[b]ecause . . . members co-operate in accommodating each other's wishes, the approval procedure provides, in essence, that members have a veto of sorts over actual or potential competition." 405 U.S. at 602, 92 S.Ct. at 1131.

**34.** *Id.* at 608. *Contrast Salco Corp. v. General Motors,* 1975 CCH Trade Reg.Rep. ¶ 60,322

(10th Cir. 1975) (decided under section 2 of the Sherman Act).

**35.** *Compare id.* at 602. *Cf. Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

**36.** *See United States v. General Motors,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874 (1st Cir. 1966). *Cf. Interstate Circuit v. United States,* 306 U.S. 208, 229–30, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Fontana Aviation, Inc. v. Beech Aircraft Corp.,* 432 F.2d 1080, 1084 (7th Cir. 1970).

**37.** *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

Although the trial court here might have been justified if he had concluded that HI had acted autonomously in rejecting AMI's application, the evidence in the record is sufficient to justify the finding actually made that HI, the Flecks and the Carteret franchisee combined or conspired to deny AMI's request for a competing franchise.[38]

## D. THE NATIONAL CONSPIRACY TO ALLOCATE MARKETS THROUGH THE RADIUS LETTER.

The district court concluded that HI's practice of sending radius letters to the three inns nearest the proposed sites effected a general or national conspiracy among HI's franchisees, as well as a local one, to divide the market among themselves. Each Holiday Inn, the court found, was able to impede the granting of a franchise which the existing licensee believed would compete with his own motor hotel. "Holiday Inns franchisees," the court held, "have utilized the parent HI . . . to allocate territories horizontally so as to restrict intra-brand competition." [39]

 We agree with HI, however, that the issue of a general or national conspiracy was not fairly litigated in the

trial court because AMI and the trial judge on a number of occasions indicated to counsel for HI that, apart from the non-Holiday Inn clause and the company town policy, there remained in the case no issue as to a national conspiracy.

After a litigant has stipulated what factual issues he intends to try before the district court, he may not, over the objection of the opposing party, thereafter prejudice his opponent by raising issues beyond the scope of the stipulation.[40] One of the basic tenets of American jurisprudence is that procedural fairness requires that each party have notice of the issues involved and an opportunity to be heard at a meaningful time and in a meaningful manner.[41]

In the present case HI, in an attempt to refute the suggestion that the radius letter practice resulted in a general conspiracy among HI's franchisees throughout the nation to divide the market among themselves, made several offers of proof to the effect that there was vigorous competition among Holiday Inns.[42] Counsel for AMI objected that such evidence would be irrelevant because the case no longer contained an allegation of a national or general conspiracy (as opposed to the local one involving the Newark application).

---

**38.** We need not here resolve the issue of the continuing viability of the exclusive dealership cases such as *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), in the wake of *Topco*. There is no finding here that either of the protesting franchisees either possessed or requested an exclusive franchise. In fact, the trial court found that the only exclusive franchises ever granted by HI were located elsewhere, and that HI had ceased awarding exclusive franchises in 1968. Moreover, the granting of an exclusive franchise here would have required an independent business decision on the part of HI regarding the advisability of such an exclusive license. The district court found that HI exercised no such independent judgment.

**39.** 365 F.Supp. at 1090.

**40.** *See United States v. Reading Co.*, 289 F.2d 7 (3d Cir. 1961); *Bryan v. Commissioner*, 209

F.2d 822 (5th Cir. 1954); *cert. denied* 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715 (1955). *Cf. Chapman v. Potomac Chemical Co.*, 81 U.S. App.D.C. 406, 159 F.2d 459 (1947).

**41.** *See Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). *Cf. Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**42.** HI's rationale apparently was that if the radius letters acted as a conspiracy which enabled existing Holiday Inns to prevent the franchising of new inns, the earlier entrants in any territory would have used that procedure to forestall the development of an intensely competitive situation.

Another thread to HI's argument that it was misled by the conduct of the trial judge related to the dismissal of the International Association of Holiday Inns, the intervenor-defendant. HI contends that the Association made clear in its petition to intervene that it represented

For example, counsel for HI asked one witness about cities in which the witness, a franchisee, operated only one of the several Holiday Inns. AMI's attorney objected on the ground of relevance.

HI: There is supposedly in this complaint a conspiracy to divide markets among the franchisees, and I want to show the markets in which they are not divided.

AMI: Stated most charitably, that is a distortion of what is involved in this case.

. . . . .

There is no charge in this case concerning whether or not Holiday Inns did or did not grant, except in Elizabeth, New Jersey, a Holiday Inn to another.

. . . . .

Court: The one thing that has been attacked by the plaintiff here is the fact that your clause prevents him from having other than a Holiday Inn in Elizabeth, New Jersey, and secondly, that there is a conspiracy which prevented him from getting a franchise for a Holiday Inn in Elizabeth. I understand those are the two governing issues. Am I wrong about that [counsel for AMI]?

AMI: Your Honor is correct, the only addition to that as to Elizabeth is that of course the clause, the non-Holiday Inn clause keeps us from operating in areas other than Elizabeth, of course.

[The court then clarified that the inter-relationship of the non-Holiday Inn clause and the parent company town policy is also involved in the case.]

Later, HI again offered a franchisee's testimony that he was not involved in any general conspiracy to allocate markets through the radius letter procedure. AMI objected. The trial judge stated that no allegation of conspiracy had been made against the witness.

HI: If there is no contention in this case that any franchisees are in conspiracy with the parent company other than Fleck and Carteret—

Court: [Counsel], where have you been all this time? That matter was disposed of at the end of plaintiff's case and I thought I had made it perfectly clear.

By one means or another, you keep trying to drag back into this case something that was never in it originally and, as I understand it, was not in it at the time the case was started and as to which this Court ruled at the end of [AMI's] case. . . . Now—

HI: There is no national conspiracy in this case, your Honor?

Court: [Counsel for AMI], are you alleging a national conspiracy in this case?

AMI: Your Honor, what we are alleging, very simply, is a conspiracy to deny us a Holiday Inn franchise at Elizabeth, New Jersey, one, and two, that the non-Holiday Inns clause violates the antitrust laws . . . in that it divides and allocates territories and markets between and among the franchisees including the plaintiff and between Holiday Inns, on the one hand, and the plaintiff on the other

both itself and the licensees who composed its membership, and that by dismissing the Association the court indicated that neither the Association nor any of its members had been implicated in any conspiracy. Therefore, HI concludes, there could logically be no national conspiracy in the case because HI had no one with whom to conspire.

A fair reading of the record, however, demonstrates that when the trial judge dismissed the Association, he explained that the basis of his ruling was that since AMI had failed to produce any evidence indicating that the Asso-

ciation, as an entity, had itself joined in a conspiracy to restrain trade, there was no basis on which the Association could be held liable. The court therefore granted the Association's motion to dismiss the complaint against it. In an antitrust action, of course, the plaintiff ordinarily need not join all the alleged co-conspirators as defendants, as long as the plaintiff does not seek to enforce the judgment against those not made defendants. *See United States v. General Motors,* 384 U.S. 127, 129, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

hand and between and among inter-brand competitors.

The Court sustained AMI's objection.

On another occasion AMI again, in the context of an objection to the relevance of HI's proof that many Holiday Inns have been franchised at competing locations, stated the theories on which it was proceeding:

> AMI: What we have contended is that the non-Holiday Inns clause operates to prevent interbrand competition and intraband competition, to the extent that (a) in company towns it eliminates competition on a horizontal level and (b) to the extent that we are a Holiday Inn operator and are precluded by the non-Holiday Inn clause from operating at certain locales it prevents competition and that is all.

> Court: That is my understanding of the state of the record, too. If either of those two objectives can be achieved in refutation through this witness, you may proceed. If not, I am going to suggest to you . . . that it is irrelevant to any of the issues before me.

> . . .

> AMI: The only other branch to our case is the Elizabeth situation which is special or different in the context from which we are now speaking.

The quoted passages [43] from the trial transcript indicate the position taken by AMI and the reaction of the trial court with respect to the presence in this case of an allegation that HI conspired with its franchisees nationwide to divide territories between them through the use of the radius letter. Both the court and AMI emphasized that the only contested issues in the case involved the Newark application, the alleged presence of company towns and the non-Holiday Inn

clause. In this context, therefore it would appear unfair to decide the lawfulness, in general, of HI's radius letter practice. Not only has certain evidence put forth by HI, which may be relevant to that question, been rejected, but the assurances by AMI and the court that no such issue was outstanding may reasonably have dissuaded HI from offering additional evidence on the subject. Accordingly, AMI will be bound by its own analysis in open court of the issues to be litigated.

## E. THE NON–HOLIDAY INN CLAUSE.

### 1. *The Rule of Reason Test*

AMI contends, and the district court determined, that the restriction on Holiday Inn franchisees' ownership of motor hotels other than Holiday Inns constituted an unreasonable restraint of trade which violated the Sherman Act.

Despite the years since its pronouncement, *Chicago Board of Trade v. United States* remains the crucible for assaying the legality of a restraint under section 1. There, Justice Brandeis explained the sort of scrutiny that is required before a trial court may determine that a restraint of trade, not *per se* illegal, exceeds the bounds permissible under the rule of reason:

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the re-

---

**43.** Other portions of the transcript perhaps indicate that HI was aware that the nationwide operation of the radius letter procedure was still, at least at those instants, a contested issue in the case. A fair reading of the record as a whole, however, supports the conclusion that counsel for HI could reasonably have concluded that the national effect of the radius letter practice was not an issue on which HI would be held to have violated antitrust laws.

straint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.[44]

The district court's analysis of the non-Holiday Inn clause refers to three considerations in support of its conclusion that the clause is condemned under section 1 of the Sherman Act: (1) "The Holidex system can be protected adequately without a 'device' as restrictive of competition as the non-Holiday Inn clause;" (2) the non-Holiday Inn clause results in "the foreclosure of all hostelers competing with HI from doing business with all HI franchisees;" and (3) "the effect of the . . . clause 'is the intended one of reducing and preventing competition among Holiday Inns franchisees and between franchised inns and company-owned inns.' "[45]

 The trial judge's explanation of the grounds for his conclusion that the non-Holiday Inn clause is unlawful, however, does not reflect any exploration into one of the major determinants under the rule-of-reason test—the impact of the restraint on competition within the relevant market.[46] In *Schwinn* the Supreme Court said, "Our inquiry is whether . . . the effect upon competition in the market place is substan-

tially adverse."[47] It is only if the *impact* of the restriction is to unreasonably restrain competition that it is illegal.[48]

Justice Frankfurter, concurring in *Associated Press v. United States,* phrased the test as follows:

The decisive question is whether it is an unreasonable restraint. This depends, in essence, on the significance of the restraint in relation to a particular industry.[49]

Here the district court's opinion terminates its Sherman Act analysis of the clause after finding that the clause was intended to and did reduce competition among HI and its franchisees, and that the Holiday Inn referral system could be protected by other means. The analysis does not take into account whether the competition eliminated by the clause is significant within the context of the total competition extant in the industry, nor does the analysis attempt in any way to measure the effect of the challenged restriction on the market structure.

 In addition, the district court does not point to any testimony to the effect that the challenged clause makes it any more onerous for other motel operators to compete effectively with HI or its franchisees. Although the court made some findings relevant to the anticompetitive effect of the clause, the portion of the opinion reflecting the legal analysis of the non-Holiday Inn clause under the Sherman Act does not demonstrate that considerations like the number or size of the firms in the industry or HI's market share played any part in

---

44. 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

45. 365 F.Supp. at 1093–94.

46. *See Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 615, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Travellers Ins. Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80, 84 (3d Cir.), *cert. denied* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). *Cf. White Motor Co. v. United States,* 372 U.S. 253, 263,

83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Albrecht v. Herald Co.,* 390 U.S. 145, 154–56, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (Douglas, concurring).

47. *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967).

48. *Id.* 388 U.S. at 380, 87 S.Ct. at 1866 (emphasis added).

49. 326 U.S. 1, 27, 65 S.Ct. 1416, 1428, 89 L.Ed. 2013 (1945).

the court's decision on this question.[50] Indeed, the court does not, in deciding the Sherman Act issue, even discuss what the relevant market is,[51] although the cases make it clear that such a market definition is fundamental to evaluating the reasonableness of the restraint.[52]

Because the district court opinion does not demonstrate that in making his rule of reason analysis the trial judge took into account many of the relevant conditions in the industry, that portion of the judgment regarding the reasonableness of the non-Holiday Inn clause must be vacated. Since the parties may have adduced at trial relevant information which is not manifested in the district court's opinion, the case will be remanded for a re-evaluation of this question by the district court on the basis of the existing record.

The Supreme Court—finding itself in a similar situation in a rule of reason case—stated: "We only hold that before we can pass on the [section 1] questions tendered, findings . . . must be made which reflect an appraisal of the complex of factors bearing on the question of reasonableness. This is a function of the District Court."[53]

If the restraint on competition caused by the non-Holiday Inn clause is otherwise reasonable, HI's purpose in adopting the clause, as found by the trial judge here, does not by itself render the clause a violation of the Sherman Act. Concededly, an agreement is inimical to section 1 if it results in an otherwise *reasonable* restraint of trade but was *designed* to achieve a forbidden restraint.[54] Thus a contract, regardless of its actual effect, contravenes the Act if it was intended as part of a scheme to monopolize or to fix prices or to drive a competitor out of the market.[55] In the present case, however, the trial judge found that the intended effect was the one which was in fact achieved.[56] The issue remains, therefore, whether that resultant restriction on competition is, under the circumstances of this case, unreasonable.

Although relevant to ascertaining the reasonableness of the non-Holiday Inn clause, it is not determinative that the Holidex system could, as the district court found, be "protected adequately" by less restrictive alternatives. In a rule of reason case, the test is not whether the defendant deployed the least restrictive alternative. Rather the issue is whether the restriction actually implemented is "fairly necessary" in the circumstances of the particular

---

**50.** Compare *United States v. First National Bank,* 376 U.S. 665, 668–70, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964).

**51.** The trial court did define a "relevant market" in the course of its evaluation of the clause as an exclusive dealing contract under section 3 of the Clayton Act, 15 U.S.C. § 14. However, the trial judge indicated that he did not consider the relevant market or the resultant market shares in making his Sherman Act evaluation. 365 F.Supp. at 1093–97.

**52.** See 1 Von Kalinowski, Antitrust and Trade Regulation §§ 6.02[1], 6.02[4] (1971); *United States v. First National Bank,* 376 U.S. 665, 667–68, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). *Cf. Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 328, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (dictum).

In addition, as explained more fully below, the district court's definition of the relevant

product market is questionable. *See* text accompanying notes 65–71.

**53.** *Schine Theatres v. United States,* 334 U.S. 110, 124, 68 S.Ct. 947, 955, 92 L.Ed. 1245 (1948).

**54.** *United States v. Columbia Steel Co.,* 334 U.S. 495, 522, 525, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

**55.** *See Poller v. Columbia Broadcasting System,* 368 U.S. 464, 468–69, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *American Column and Lumber Co. v. United States,* 257 U.S. 377, 409, 42 S.Ct. 114, 66 L.Ed. 284 (1921); *Anderson v. American Automobile Ass'n,* 454 F.2d 1240, 1246 (9th Cir. 1972); *Fontana Aviation, Inc. v. Beech Aircraft Corp.,* 432 F.2d 1080, 1085 (7th Cir. 1970).

**56.** 365 F.Supp. at 1084.

case,[57] or whether the restriction "exceed[s] the outer limits of restraint reasonably necessary to protect the defendant." [58]

■ The Ninth Circuit has stated in *Siegel v. Chicken Delight, Inc.* that "Restraint of trade can be justified only in the absence of less restrictive alternatives." [59] The restraint involved here, however, unlike the tie-in at issue in *Siegel,* is not *per se* unlawful. Like the Ninth Circuit, the Fifth Circuit has also, in *Copper Liquor, Inc. v. Adolph Coors Co.,* utilized the "least restrictive alternative" test.[60] There again, however, as in *Siegel,* the restraint which the defendant sought to justify was one which the Fifth Circuit considered to be so detrimental in its effect on competition as to be *per se* unlawful.

■ In its descriptions of the rule of reason inquiry, the Supreme Court [61] has never indicated that, regardless of the other circumstances present, the availability of an alternative means of achieving the asserted business purpose renders the existing arrangement unlawful if that alternative would be less restrictive of competition no matter to how small a degree.[62] In *Schwinn,* for instance, in applying the rule of reason to the manufacturer's territorial and customer restraints on its agent-dealers, the Court did not inquire whether there was some substitute method by which Schwinn could compete with the chain stores that would result in a lesser restriction on competition between its dealers. Rather, the Supreme Court was satisfied that the Schwinn program of territorial and dealer restrictions was lawful once it concluded the restraints did not exceed "the limits *reasonably necessary* to meet the competitive problems." [63] In addition, the Ninth Circuit itself, in an opinion more recent than *Siegel,* has in a rule of reason case applied the "fairly necessary" standard.[64]

Application of the rigid "no less restrictive alternative" test in cases such as this one would place an undue burden on the ordinary conduct of business. Entrepreneurs such as HI would then be made guarantors that the imaginations of lawyers could not conjure up some method of achieving the business purpose in question that would result in a somewhat lesser restriction of trade. And courts would be placed in the position of second-guessing business judgments as to what arrangements would or

57. *Anderson v. American Automobile Association,* 454 F.2d 1240, 1246 (9th Cir. 1972).

58. *Walt Disney Productions v. American Broadcasting-Paramount Theatres,* 180 F.Supp. 113, 117 (S.D.N.Y.1960). *See also Bascom Launder Corp. v. Telecoin Corp.,* 204 F.2d at 331, 335 (2d Cir. 1953).

59. 448 F.2d 43, 51 (9th Cir. 1971), *cert. denied* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

60. 506 F.2d 934, 942–43 (5th Cir. 1975). The challenged restraint was a restriction on the territory within which Coors' distributors could resell the beer they had purchased from Coors. The brewer contended that because of its unique brewing methods, the constraints were essential to avoiding spoilage of the beer. The Fifth Circuit regarded the territorial limitations on distributors' resale as *per se* unlawful. *Compare Tripoli Co. v. Wella Corp.,* 425 F.2d 932 (3rd Cir.), *cert. denied* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

61. In his concurring opinion in *White Motor Co. v. United States,* 372 U.S. 253, 270–72, 83 S.Ct. 696, 706, 9 L.Ed.2d 738 (1963), Justice Brennan suggested that the availability of less restrictive alternatives is one of the factors which should be considered in determining whether vertically imposed territorial restraints should be *per se* unlawful. He concluded, however, by stating "no such inquiry . . . into the question of alternatives could meaningfully be undertaken until the District Court has ascertained the effect upon competition of the particular restraints in suit . . . ."

62. *See, e. g., Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

63. *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 380–81, 87 S.Ct. 1856, 1866, 18 L.Ed.2d 1249 (1967) (emphasis added).

64. *See Anderson v. American Automobile Ass'n,* 454 F.2d 1240, 1246 (9th Cir. 1972).

would not provide "adequate" protection for legitimate commercial interests.

2. *The Contention that the Non-Holiday Inn Clause is Valid Because it Would Not Violate the Standards of Section 3 of the Clayton Act.*

HI offers an additional argument which, if accepted, would enable the Court to conclude that the non-Holiday Inn clause is lawful under the Sherman Act without going through the full rule of reason analysis.[65] HI contends that the non-Holiday Inn clause is, in effect, an exclusive dealing agreement. Although section 3 of the Clayton Act is admittedly not applicable to the non-Holiday Inn clause because no goods are involved,[66] HI asserts that the clause cannot violate the Sherman Act because the clause satisfies the standards of section 3 of the Clayton Act, and that such standards impose tighter restraints on exclusive dealing arrangements than does the Sherman Act.

■■■ HI would seem to be correct in stating that an exclusive dealing arrangement which satisfies the test of legality set out in the Clayton Act would a fortiori be lawful under the less stringent Sherman Act.[67] It would also appear true that the non-Holiday Inn clause is analogous, for antitrust purposes, to an exclusive dealing contract. We cannot say, however, on the basis of the record before us, that the clause would necessarily satisfy the standards encompassed within section 3 of the Clayton Act.

In *Tampa Electric* the Supreme Court set forth a three-step analysis for evaluating the legitimacy of an exclusive-dealing arrangement under the Clayton Act:

> *First*, the line of commerce . . . involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. *Second*, the [geographic] area of effective competition in the known line of commerce must be charted . . . . *Third*, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.[68]

To ascertain whether the exclusive dealing contract in issue forecloses competition in a substantial share of the relevant market,

> it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.[69]

---

65. *Capital Temporaries, Inc. v. Olsten Corp.,* 506 F.2d 658 (2d Cir. 1974), cited by HI in support of the proposition that exclusive-dealing agreements between franchisors and their franchisees are, in effect, *per se legal* under the Sherman Act, is inapposite to the facts here. *Capital Temporaries* involved only a restriction on the franchisee's competing with his own franchised dealership, and a limitation on the franchisee's competing with his franchisor within a limited geographic area and a limited time after termination of the franchise.

66. Section 3 of the Clayton Act, 15 U.S.C. § 14 provides in pertinent part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . or other commodities . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

67. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 335, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Standard Oil v. United States,* 337 U.S. 293, 312, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

68. 365 U.S. at 327–28, 81 S.Ct. at 628.

69. *Tampa Electric,* 365 U.S. at 329, 81 S.Ct. 623.

Here the trial judge stated, "I would hold that the relevant 'product' market is national hotel-motel chains or referral groups." [70] The court's rationale for adopting that product market—or line of commerce—was simply that "[t]he only justification for the non-Holiday Inn clause seriously pressed by HI . . . has been the clause's role in protecting the Holidex System of computerized national referrals." [71] Applying the last two prongs of the tripartite test set out in *Tampa Electric*, he determined that, since Holiday Inns operate nationwide, the relevant geographic area was the United States, and that the non-Holiday Inn clause foreclosed hotel-motel groups which competed with HI from doing business with 14.7% of the relevant market. That degree of market foreclosure, the trial judge concluded, constituted a "substantial share" of the market and would render the non-Holiday Inn clause unlawful under the Clayton Act.

The two leading cases under section 3 of the Clayton Act are *Tampa Electric Co. v. Nashville Coal Co.*[72] and *Standard Oil Co. v. United States.*[73] In *Tampa Electric* the Supreme Court concluded that the exclusive dealing contract there, a requirements contract, was lawful under section 3 because it provided the util-

ity company with an assured supply of coal for its generating plants; because the seller was not in a dominant position in the market; because the competition in the coal industry was not hampered by widespread use of exclusive dealing agreements; and because the contract between the coal company and the utility foreclosed only .77% of the relevant market. Thus in the Court's view, it was not "probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." [74]

■ In the earlier case of *Standard Oil*, on the other hand, the Supreme Court held that the agreements there, which in effect required the contracting retailers to purchase all their gasoline from Standard, the largest seller of gasoline in the area, probably would substantially lessen competition. Standard accounted for 23% of total gasoline sales in the area. The exclusive dealing contracts which the Court struck down covered 6.7% of the area sales and foreclosed competing refiners from marketing their product through 16% of the independent gasoline retailers in the region.[75] And though *Standard Oil* has been subjected over the years to baffling winds and cross-currents, it has nonetheless survived as a viable authority.

**70.** 365 F.Supp. at 1096.

**71.** *Id.*

**72.** 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

**73.** 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

**74.** 365 U.S. at 327, 81 S.Ct. at 628.

**75.** In *Standard Oil* Justice Frankfurter, speaking for the Court, eschewed any economic investigation by the judiciary in determining whether the effect of a given exclusive dealing agreement " 'may be' to substantially lessen competition." Rather, under his quantitative substantiality test, a case would be made out under section 3 merely upon a showing that the exclusive dealing arrangement involved a significant share of the relevant market, or possibly even upon a showing that the arrangement involved a substantial volume of commerce. 337 U.S. at 299, 310–14, 69 S.Ct. 1051, 1062. *See* Von Kalinowski, Antitrust

Laws and Trade Regulation, §§ 13.04, 13.05 (1971). The *Standard Oil* test was heavily criticized as being too mechanical and as depriving the public of the economic advantages of exclusive dealing contracts over alternative arrangements. *See, e. g.,* Kessler & Stern, "Competition Contracts, and Vertical Integration," 69 Yale L.J. 1 (1959); Schwartz, Potential Impairment of Competition—The Impact of Standard Oil of California v. United States on the Standard of Legality Under the Clayton Act, 98 U.Pa.L.Rev. 10 (1949); Lockhart & Sacks, "The Relevance of Economic Factors in Determining Whether Exclusive Arrangements Violate Section 3 of the Clayton Act," 65 Harv. L.Rev. 913 (1952).

In *Tampa Electric* the Court adopted a somewhat different standard for measuring the legality of exclusive dealing contracts under section 3. As the quotation at note 68 indicates, the new test, commonly denominated the qualitative substantiality test, introduced greater flexibility and requires the courts actually to

Here, the opinion of the district court does not demonstrate a consideration of sufficient factors to constitute the type of economic analysis explicated by the Supreme Court in *Tampa Electric.* In the portion of his opinion which concludes that the non-Holiday Inn clause would violate the Clayton Act standards, the trial judge in effect relied exclusively on statistics relating to the percentage of the market foreclosed. The district court did not indicate that it had considered "the probable immediate and future effects which preemption of that share of the market might have" within the competitive context of that industry, nor did it in any way advert to the "relative strength of the parties."

*Tampa Electric* makes clear that in deciding whether an exclusive dealing contract violates section 3, the judiciary must take into account the economic justification for the arrangement.[76] HI argues that the non-Holiday Inn clause protects the Holidex referral system, enables the International Association of Holiday Inns to assess the member inns for joint improvements like the Holiday Inn University, and promotes competition in the hotel-motel industry by fostering a sense of loyalty among HI's franchisees which stimulates a free exchange among the innkeepers of ideas and suggested improvements. Although AMI disputes the significance of some of these business justifications for the clause, the district court, under *Tampa Electric*, should have assessed the clause's restraint on competition in light of these asserted justifications.

Holiday Inns constitute the largest hotel-motel group in the country; the Holiday Inn chain is three times the size of its largest competitor.[77] In view of these factors if the non-Holiday Inn clause does, as the district court determined, foreclose competitors of HI from 14.7% of the market, the clause may well offend the limitations which the Clayton Act places on exclusive contracts.[78] The trial judge, however, has not made clear that he conducted the broad inquiry required by *Tampa Electric.*

Because the district court's delineation of the relevant product market appears erroneous, this Court cannot, on the record before it, determine for itself whether the non-Holiday Inn clause would be a valid exclusive dealing contract under the Clayton Act, and therefore a fortiori valid under the Sherman Act. Although market definition is generally regarded as a question of fact, a trial court's determination of the market may be reversed where that tribunal has erred as a matter of law.[79] Here, in ascertaining the extent of the market the district court did not apply the proper legal standard.

evaluate the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market. *See* Von Kalinowski, *supra*, §§ 13.04, 13.-05, 14.04; Bok, The Tampa Electric Case and the Problem of Exclusive Arrangements Under the Clayton Act, 1961 Sup.Ct.Rev. 267; Note, 75 Harv.L.Rev. 202 (1961); *Susser v. Carvel Corp.*, 332 F.2d 505, 516–17 (2d Cir. 1964). Although the Supreme Court has modified the rigid rule articulated in *Standard Oil*, it has not indicated that the result in *Standard Oil* would differ from *Tampa Electric.* Indeed, the *Tampa Electric* opinion impliedly endorses the result reached in *Standard Oil. See* 365 U.S. at 328–29, 81 S.Ct. 623. Therefore, the district court here would not appear unjustified in comparing the facts before it to those in *Standard Oil.*

**76.** 365 U.S. at 334–335, 81 S.Ct. 623.

**77.** 365 F.Supp. at 1084.

**78.** *See* Von Kalinowski, Antitrust Laws and Trade Regulations § 14.04 (1971); *Mytinger & Casselberry, Inc. v. F. T. C.*, 112 U.S.App.D.C. 210, 301 F.2d 534 (1962); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Cornwell Quality Tools Co. v. C.T.S. Co.*, 446 F.2d 825 (9th Cir. 1971), *cert. denied* 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972).

**79.** *See United States v. Phillipsburg National Bank*, 399 U.S. 350, 360, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *Telex Corp. v. International Business Machine Corp.*, 510 F.2d 894, 914–19 (10th Cir. 1975).

 The Supreme Court has ruled that whether two products or services are within the same market is to be decided on the basis of whether they are "reasonably interchangeable."[80] It would seem, therefore, that the proper demarcation of the market in this case would depend on (1) whether Holiday Inns are reasonably interchangeable with other hotels or motor inns, insofar as the traveling public is concerned, or (2) whether HI's franchisees are reasonably fungible with other persons as potential franchisees for other hotel-motel chains. Since the factual issues relevant to interchangeability have not been resolved, this Court is unable to define the limits of the market or markets involved here, and thus we are unable to assess the degree to which the non-Holiday Inn clause forecloses competition in such markets.

We cannot, therefore, decide whether HI is correct in asserting that the non-Holiday Inn clause is an exclusive dealing agreement which satisfies the even more exacting requirements of the Clayton Act.

## F. THE COMBINED EFFECT OF THE CHALLENGED PRACTICES.

The district court concluded that the combined effect of the radius letter procedure, the company-town policy and the non-Holiday Inn clause was a horizontal allocation of territories which is *per se* unlawful.

> [P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. " . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[81]

We have already decided[82] that the question of what significance HI generally or nationally affords to objections in response to radius letters regarding applications for new franchises was, in effect, withdrawn from consideration during the course of the trial. Therefore, we are not in a position to judge whether the radius letter procedure in combination with the non-Holiday Inn clause results in an unreasonable restraint of trade on a national basis.

 The combination of the company-town policy and the non-Holiday Inn clause, however, does create a basis for finding a horizontal conspiracy between HI, operating on the retail level as a motel-operator, and HI's franchisees. For example, the district court found that the "company-town policy standing alone prevents AMI from building a Holiday Inn in competition with the company-owned inns in Fort Worth. The non-Holiday Inn clause also prevents AMI from building a Sheraton Inn in Fort Worth."[83] The net result of the two practices is that HI and its franchisees have agreed to a division of territories.

The district court concluded that the company-town policy, standing alone, would be satisfactory because, although it resulted in an allocation of territories, it was imposed unilaterally by HI. When the company-town policy is joined with the non-Holiday Inn clause, however, the element of "contract, combination or conspiracy" is fulfilled by the presence of the non-Holiday Inn clause in the franchise agreement, whether or not the non-Holiday Inn clause alone is valid.

Acts by a franchisor, such as HI, that create otherwise unreasonable restraints of trade are not insulated from the antitrust laws by the fact that such company

---

80. *United States v. E. I. DuPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). *See Phillipsburg National Bank*, 399 U.S. at 362–64, 90 S.Ct. 2035; *United States v. Charles Pfizer & Co.*, 246 F.Supp. 464 (E.D.N.Y.1965).

81. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962).

82. *See* text accompanying notes 39–43.

83. 365 F.Supp. at 1097.

functions as a franchisor as well as a motel operator. The circumstances of this case are similar to those in *Hobart Brothers v. Malcolm T. Gilliand, Inc.*[84] Hobart, a manufacturer of welding equipment and supplies, sold its products through distributors and also competed with those distributors by selling directly to ultimate users. Gilliand was a distributor of Hobart's products and manufactured a line which competed with Hobart's products. The Fifth Circuit held that the distribution agreement between Hobart and Gilliand that restricted Gilliand's sales of Hobart products to a specified territory constituted a horizontal allocation of territories which was a *per se* violation of the Sherman Act since, as rival distributors, the two firms operated on the same market level.[85]

In the present case, since HI, in one of its capacities, was dealing on the same market level as its franchisees, its contracts that, in effect, foreclosed such franchisees from operating either Holiday Inns or non-Holiday Inns in cities where HI operated an inn, except with HI's permission, constitute market allocation agreements among competitors. The district court therefore did not err in ruling that the combination of the non-Holiday Inn clause and the company-town policy constituted an unlawful restraint of trade.

## G. AMI's ALLEGED PARTICIPATION IN THE CONSPIRACY TO DIVIDE MARKETS.

■■ HI asserts as an affirmative defense to the allegation of Sherman Act liability that, if there was a nationwide conspiracy to allocate markets geographically through the radius letter practice or the non-Holiday Inn clause, AMI should not be permitted to recover treble damages because AMI has been a participant in such conspiracy. This Court has already determined that the national implications of the radius letter practice were not litigated in this case. Relevant to our consideration of the award of damages resulting from the allocation of markets through the combination of the company-town policy and the non-Holiday Inn clause is the Supreme Court's holding that the common law doctrine of *in pari delicto* does not generally apply to federal antitrust actions:[86]

> The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit [in order] to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement.

---

**84.** 471 F.2d 894 (5th Cir. 1973).

**85.** *See Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711 (S.D.N.Y.), aff'd per curiam, 417 F.2d 621 (2d Cir. 1969) (Territorial customer restrictions in distributorship agreement between Minolta, which sold its cameras both through its own distribution system and through independent distributors, and Interphoto, an independent distributor of Minolta's cameras, constitutes a horizontal market allocation). *Cf. United States v. McKesson and Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956) (Agreements between McKesson, a drug manufacturer which also operated as a distributor, and its independent distributors, relating to the resale price of McKesson products, are not insulated from the Sherman Act by the McGuire and Miller-Tydings Acts because the agreements are between competing distributors rather than between a manufacturer and a distributor).

HI cites *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658 (2d.Cir. 1974), to support its argument that a non-competition agreement between a franchisee and its franchisor, who also competes with the franchisee, is not a horizontal conspiracy. That case, however, is not on point in this respect because the non-competition agreement there related only to the franchisee's competing with his own franchised operations, and an ancillary limitation on the franchisee's competing with the franchisor within a limited time after termination of his franchise and within a limited geographic area.

**86.** *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968).

The Supreme Court reserved the question whether damages might be denied an antitrust plaintiff on the narrower ground that the plaintiff had actively supported the entire restrictive program, participated in its formulation and encouraged its continuation. However, in this case, we cannot say that the district court erred in concluding that AMI's participation was not of that character.

## H. DAMAGES.

At the conclusion of the portion of the trial devoted to liability, AMI and HI stipulated to treble damages in the amount of $4 million. It is unclear from the record whether that stipulation was based solely upon AMI's exclusion from the Newark area and from parent company-towns or whether it included damages caused by exclusion from other cities nationwide.[87] Because the basis for the stipulated damages is not readily apparent, on remand the parties should again stipulate or the Court should determine the appropriate damages consistent with this opinion and in light of the district court's re-evaluation of the non-Holiday Inn clause.

## I. CONCLUSION.

The judgment of the district court will be affirmed in part, reversed in part, and vacated in part, as set forth in detail below:

A. The judgment is affirmed insofar as it found a combination or conspiracy with respect to the application for a franchise at the Newark airport.

B. The finding of a national conspiracy to allocate markets through the use of radius letters is reversed.

C. The judgment regarding the question whether the non-Holiday Inn clause alone constitutes an unreasonable restraint of trade is vacated and the cause is remanded for a re-evaluation of the reasonableness of the

clause on the basis of the evidence already adduced.

D. The judgment will be reversed insofar as it determined that the combined effect of the radius-letter procedure, the company-town policy and the non-Holiday Inn clause constituted an unreasonable restraint of trade.

E. The judgment will be affirmed to the extent that it determined that the combination of the company-town policy and the non-Holiday Inn clause constituted an unreasonable restraint of trade.

F. The amount of damages will be reconsidered in light of this opinion and any subsequent determination regarding liability made by the district court on remand.

The cause will be remanded to the district court for further proceedings consistent with this opinion.

87. As previously discussed, the district court determined that AMI was excluded not only from Newark but also from other cities throughout the nation as a result of HI's use of

radius letters. We have held above, however, that the reasonableness and legality of exclusions, other than from Newark and from company-towns, was not fully litigated below.